## JONES et al *v.* HUNTER et al.

An amended answer, offered to be filed by third persons, who had, pending the suit, purchased, at a judicial sale made by order of another court, the title of the defendant to the property in contest in a petitory action, and who had been substituted in place of the original defendant, in which they set up the title so acquired by them, cannot be excluded as changing the

character of the suit, by setting up a title under judicial proceedings, the validity of which cannot be tested in the suit in which their answer is offered.

The testimony of a single witness that, he knew a person as a married woman for a few months before her death, in a neighborhood into which she had lately removed a stranger from another State, is insufficient to prove her marriage. *Per Curiam:* Her *status* cannot be proved by the general reputation of that neighborhood ; and we are not prepared to say that, where the proof of legitimacy is introduced for the purpose of acquiring property of great value, a single witness is sufficient to prove a marriage, by reputation.

A duly acknowledged natural child inherits the estate of her father, in default of legitimate relations or a surviving wife.

Property claimed in an action cannot be alienated, pending the action, to the prejudice of the party claiming it.   C. C. 2428.

One who has caused himself to be substituted in the place of the original defendant in a suit, who was his warrantor, debars himself of the right to obtain a judgment in warranty against the latter.

APPEAL from the District Court of Concordia, *Curry,* J.     *Thomas* and *J. Dunlap,* for the plaintiffs.   *Stockton, Steele* and *Grymes,* for the appellants. *Stacy* and *Sparrow,* for the intervenor, *Susannah Jones.*   The judgment of the court was pronounced by

ROST, J.   This case has already been before the Supreme Court, and the facts, as far as they were then disclosed, are fully stated in the opinion of the court, in 6 Robinson, p. 235.   The first appeal was taken from a judgment rendered in favor of *Susannah Jones* on the verdict of a jury.   The court recognized her as the natural child, duly acknowledged, of *John Jones,* and observed that her right to recover as an irregular heir, adversely to the other claimants, depended upon the determination of facts peculiarly within the province of the jury, whose verdict, on such questions, should always be maintained, unless manifestly erroneous.   The case was remanded on account of errors in the charge of the judge to the jury.

After the mandate of the Supreme Court was filed in the District Court, all *Collier's* interest in the property was sold under execution, and purchased by *Amis* and *Featherston,* who intervened in the suit.   Subsequently, on their application, after suggesting to the court the bankruptcy of *Collier,* and the insolvency and death of *Hunter* and *King,* it was ordered that they, the said *Amis* and *Featherston,* be permitted to assume the position of those parties; and, the judge states that, being then in court, they did assume that position, and waive any citation or notice in relation thereto.   Before the trial of the cause, these parties asked leave to file an amended answer, which was refused by the court, on the ground that the amended answer set up, in *Amis* and *Featherston,* a right acquired since the preceding term of the court, by virtue of a probate sale of the property in controversy, the validity of which proceedings could not be tested in this suit, and that said amendment changed the character of the suit.

We think the court erred in refusing to admit the amended answer, and as all the evidence in support of it is annexed to the bill of exceptions, we will consider both the answer and the evidence as being properly before us.   We do not perceive that they change the character of the suit ; and the facts of the case show, beyond the possibility of a doubt, the real nature of the proceedings had in the Court of Probates of the parish of Madison.

*Amis* and *Featherston* took other bills of exceptions, which the opinion we have formed makes it unnecessary to notice.

The case comes before us on the appeal of *Featherston* and *Amis* from the judgment rendered on the second verdict in favor of *Susannah Jones,* and, as the

Jones
*v.*
Hunter-

appeal was granted in open court, we consider that all the parties to the suit had notice of it, and are entitled to be heard.

After two unimpeached verdicts, rendered by men who knew the parties and witnesses, and whose partialities, if they had any, must have been in favor of the legitimacy, we concur with the former court, that any interference, on our part, would be ill-advised, unless the evidence should force upon us the conclusion that manifest injustice had been done.

*Mrs. Overacre,* the main witness of the defendants, has testified that she knew *Hannah Rhodes,* the mother of *John Jones and his sister;* that the said *Hannah* was her sister, and was lawfully married to *Charles Jones,* the father of *John Jones* and *Mrs. Bass,* under whom the defendants claim, near the north fork of the Holston river, in the State of Tennessee, previous to the year 1790; she swears that she was present at the marriage. Her evidence is positive; but two successive juries have refused to believe it; and, as there are in her deposition circumstances throwing reasonable doubts upon her veracity, we are not prepared to say that they have exceeded the discretion vested in them.

*Henry Flower,* whose testimony bears the stamp of truth, states that he had known *John Jones* and his *sister,* in the neighborhood of Natchez, in 1792 or 1793, at which time they were both small children. He also knew their father and mother, and lived after that time thirteen or fourteen years within a mile of the house of *Charles Jones.* The witness siates that *Charles Jones* and *Hannah Rhodes* treated each other as husband and wife; that they were reputed to be such, and their children passed for *legitimate, forced heirs;* that *Hannah Rhodes* died in 1792 or 1793, after which event *Charles Jones* lived, at the same place, with the *widow Smith,* as man and wife, and had eight or nine children by her.

The survivors of those children are the plaintiffs in this suit. There is no doubt as to their existence, and the cohabitation, whatever be its character, of their father and this widow. Yet *Mrs. Overacre,* residing in the immediate neighborhood during that cohabitation and the birth of the children, when interrogated in relation to this episode in the life of her pretended brother-in-law, is as positive in her denial of all knowledge of the *widow Smith* and of her children, as in her affirmance of the marriage of her sister. That portion of her testimony cannot be true; she is an unfair and partial witness, whom the jury might well refuse to believe.

Disregarding her evidence, the testimony of *Flower* extends over too short a period of time to establish the marriage by general reputation. He states that he knew the parties, in the neighborhood of Natchez, in 1792 or 1793, and that *Hannah Rhodes* died in 1792 or 1793. He knew her but a few months before her death; and, as she had lately arrived from Tennessee, a stranger to all but *Mrs. Overacre,* her *status* cannot be proved by the general reputation of that neighborhood. We are not prepared to say that where the proof of legitimacy is introduced for the purpose of acquiring property of great value, we would consider one single witness sufficient to prove marriage by reputation.

Circumstances are proved militating for, and others against, the probability of the marriage; but after a careful perusal of all the evidence, we cannot say that there is manifest error in the verdict of the jury, so far as it affects the defendants.

The evidence adduced by the plaintiffs in proof of their legitimacy, is still less satisfactory; it has produced no conviction on our minds; and supposing it to be true, it is very questionable whether the plaintiffs would have any rights,

the district of country where the marriage is said to have been performed by a *baptist preacher*, being under the dominion of Spain at the time.

The witness *Leland*, who swears that a marriage was celebrated by a baptist preacher between *Charles Jones* and the widow *Smith*. in the year 1799, is evidently one sided, and has rendered himself obnoxious to the same charge as *Mrs. Overacre;* although, at the age of 86 his memory is precise, beyond belief, as to all facts which may be of advantage to the plaintiffs, he has never heard of *Hannah Rhodes*, and never heard the name of *John Jones* mentioned. In many of his answers, he evades the questions put to him, and does not answer at all the questions as to the time when *Charles Jones* and the widow *Smith* went to live together. The jury may have inferred from the testimony of *Henry Flower* that the cohabitation commenced soon after the death of *Hannah Rhodes*, so that, supposing the testimony of *Leland* to be true, the cohabitation had lasted five or six years at the time of the marriage, and it is not proved that the plaintiffs or their ancestors, were born after the year 1799.

The witness *Sarah Cochran*, does not swear to the fact of the marriage; but the reasons she gives to make it probable, that three priests were residing in Natchez at the time, and that they would not have permitted a man and woman to live together without being married, is untrue, and renders her testimony of no value. It is an historical fact that there were but four priests in the whole valley of the Mississippi at that time, and three of them never had their residence at Natchez, at the same time.

The testimony of *Flower*, instead of supporting the pretensions of the plaintiffs, renders, in our opinion, the marriage improbable.

We cannot say that the jury erred, in considering that no marriage had been proved between *Charles Jones* and either *Hannah Rhodes* or the widow *Smith*. They appear to have had sufficient reasons to give faith to the declarations of *John Jones*, made at a time not suspicious, to his friend *Groves*, that legitimacy was a relation unknown in his family. His own daughter is no exception to the rule; but, as he has acknowledged her, she is entitled to his inheritance in default of legitimate relations or a surviving wife, unless the intervenors, *Amis* and *Featherston*, can withhold it from her. A statement of some of the facts of the case is necessary to a proper undestanding of their claim.

In 1834, one *Thomas Bernard* sued the curator of *John Jones*, who suffered a judgment to go against him by default for the sum of $1,481 37, with eight per cent interest. Judgment was entered at the June term, 1837; but was only signed in June, 1843. In 1834, *Mrs. Bass* sold her hereditary rights to *John Briscoe*, and, in January, 1835, *Briscoe* and others, who appeared to have acquired an interest in the purchase, sold to *Woodhouse & Hunter* the plantation and slaves forming the whole property of the succession. In 1836, the curator having died, *Thompson L. King* was appointed in his place, and subsequently purchased the interest of *Woodhouse* in the plantation and slaves.

In 1844, *Amis* and *Featherston*, to make, as they supposed, assurance doubly sure, and divest plaintiffs, defendants, and intervenors of any title they might have in the property of the succession, purchased the judgment rendered in favor of *Bernard*, with the view to cause the property of *John Jones*, then in their possession, to be sold under it; but as they could not aver in their own names that the property still belonged to the succession of *Jones*, because they had it in possession as their own, and had received the fruits of it for years, they resorted to a shallow disguise to accomplish their object. They transferred the judg-

JONES
*v.*
HUNTER.

ment to *William Amonett*, one of their counsel: and whilst three distinct sets of heirs were present or represented, all claiming the succession of *John Jones*, *James Ira Amonett*, another counsel of *Amis & Featherston*, falsely representing that succession as vacant, caused himself to be appointed curator during the recess of the District Court, and induced the Court of Probates to go through the solemn farce of appointing an attorney of absent heirs. The curator acknowledged as justly due, a claim about which he could have no knowledge, and, instead of proceeding to reduce to posession the property of the succession, and to administer it as, by law, he was bound to do, he suffered *William Amonett* to take a judgment against him, and to cause to be sold, *en masse*, under it, not the right, title and interest which the succession might still have in the property, but the land and slaves themselves, surrendered by *Featherston & Amis*, were sold as the property of the succession. *Featherston & Amis* stood by during the sale, and, instead of protesting against it, they became the highest and last bidders, and the whole property was adjudicated to them. We do not perceive how, after the adjudication, they could be permitted to set up any other title than that which it conferred upon them; their surrender and subsequent purchase of the property, amounted to an acknowledgment that they were previously knavish possessors, and they were properly made to account for the rent of the land and hire of the slaves during their possession.

Immediately after the purchase by *Amis & Featherston*, the two *Amonetts* appeared in court as their counsel of record, and moved to amend the pleadings, so as to let in the new title which they had enabled their clients to acquire. The court refused the application, and that refusal gave rise to the bill of exceptions which we have already noticed.

The strange idea seems to prevail in some minds, that nothing else is necessary to defeat the just rights of plaintiffs in petitory actions and in actions of revendication, than to make, or procure, pending the action, a transfer of the title to the property claimed. Art. 2428 of the Civil Code expressly provides that, property thus situated cannot be alienated to the prejudice of the claimant's right; and we are not left in doubt as to the meaning of that provision, for it is taken from the law 13th, tit. 7th, of the 3d Partida, which was itself taken from the dispositions of the roman law, found in the chapter *De Litigiosis* in the Justinian Code, lib. 8, tit. 37.

The rule laid down in our Code, is one of the fundamental principles of the civil law, and numerous commentators have defined the extent of its application. Any transfer of the thing in dispute, made either directly by the party from whom it is claimed, or indirectly procured through his agency, is null, agaist the claimant, with few exceptions not applicable to this controversy.

The Partidas conclude this subject by an admonition to the depositaries of power that, their most important concernment is to counteract and frustrate the fraudulent devices of the wicked. This command of the spanish law stands unrepealed, and we feel, on this occasion, the necessity, as well as the obligation, of enforcing it.

The sale of the property was evidently procured by *Amis & Featherston*, for the purpose of changing the title; the whole affair was a scheme of spoliation and fraud, under the forms of legality; the succession was not vacant, and the heirs should have been made parties to any proceedings had in relation to the property. *James Ira Amonett* was all the time the counsel of *Amis & Featherston*, not the curator of the succession of *Jones*; that succession was then in the

possession of his clients, who claimed it in its entirety, as assignees of the only heir. If they acquired the rights of the heir, they also incurred her obligations, one of which was to pay the judgment in favor of *Bernard ;* but they purchased that claim, and it was extinguished by confusion; they could not revive it before they were evicted, and their attempt to do so can be productive of no result. *Susannah Jones* was not a party to the judgment of the Court of Probates ordering the sale, and she comes under the rule of law *sententia inter alios lata aliis non prejudicat.* Neither she, nor the succession of *Jones,* were represented in that suit.

*Amis & Featherston* having, at their own request, taken the place of their immediate warrantor and of his warrantor, have debarred themselves of the right to obtain the judgment in warranty prayed for on the appeal.

The judgment appealed from has done justice between the parties.

*Judgment affirmed.*