[No. 12642. In Bank. — January 2, 1890.]

## JANE WHITE, RESPONDENT, v. LORENZO E. WHITE, APPELLANT.

MARRIAGE — EVIDENCE — COHABITATION AND REPUTE — PRESUMPTION — MATRIMONIAL CONSENT. — If a man and woman cohabit together as husband and wife, and are held and reputed by their neighbors and friends as married persons, they are presumed to have entered into marriage. Cohabitation and repute do not make marriage, but are merely items of evidence from which it may be inferred that a marriage has been entered into. The facts in evidence must be such as to justify the inference that matrimonial consent had been interchanged between the parties.

ID. — CONSENT TO MARRIAGE PRIOR TO CODE — MAXIM — CONTRACT PER VERBA DE FUTURO. — Prior to the adoption of the Civil Code in this state, consent alone constituted marriage, and the law was correctly expressed in the maxim, *Concensus, non concubitus, facit nuptias.* The contract, *per verba de futuro cum subsequento copula,* is only evidence of marriage, as proving the requisite matrimonial consent.

ID. — CHARACTER OF COHABITATION — ILLICIT INTERCOURSE — PRESUMPTIONS. — The cohabitation of a man and woman not shown to have been in its origin illicit is presumed lawful; but the law will presume intercourse from cohabitation, and if the intercourse was illicit from the beginning, in the absence of evidence from which a change to the matrimonial relation may be inferred, the illicit relation is presumed to continue, until the contrary appears. This presumption is rebuttable, whether it be regarded as a presumption of law or of fact.

ID. — CHANGE FROM ILLICIT TO MATRIMONIAL RELATIONS — HABIT AND REPUTE — VISIBLE ACTS — INTRODUCTION OF WIFE. — A change from illicit to licit or matrimonial relations may occur, and be satisfactorily established, although the precise time or occasion cannot be clearly ascertained; provided there is no impediment to marriage, and the subsequent conduct of the parties shows a general, undivided, and uniform habit and repute, from which it may be inferred that they had interchanged the requisite matrimonial consent. The repute which, with cohabitation, will be proof of marriage, must be uniform and general, and not divided and singular, and cannot be established, except by the open, undisguised, and undoubted acts of the parties, which are visible to outsiders. But the law does not require a formal introduction by the husband of the woman as his wife to each member of the social circle into which they go. It is sufficient if his conduct is such as to justify her reception in such circle as his wife.

DIVORCE — ADULTERY — PUBLIC OFFENSE — CONFLICT OF PRESUMPTIONS — EVIDENCE OF COHABITATION AND REPUTE. — It is only in cases where the question of a public offense is involved that consent to marriage cannot be proved by evidence of cohabitation and repute of marriage; and the exception proceeds upon the ground that the presumption of

marriage, without proof of actual marriage, cannot overcome the stronger presumption of innocence. Such evidence is admissible to show marriage, in an action for divorce upon the ground of mere adultery, which does not constitute a public offense.

EVIDENCE — CROSS-EXAMINATION — DISCRETION OF COURT — IMPEACHMENT — DEPOSITION OF PARTY. — When a party whose deposition was taken before the trial becomes a witness at the trial, it is an objectionable mode of cross-examination to read to the witness several questions and answers from the deposition, and ask if each of such answers was correct or true, or what was said when the deposition was taken. The court has the power to stop the continuance of such examination as a useless consumption of time. The opposite party may show any contradictory statements for the purpose of impeachment, by offering in evidence the deposition, or any part thereof, as an admission of the party, without first calling the attention of the witness to inconsistent statements; and if the deposition is afterward placed in evidence, any error of the court in stopping the cross-examination would be rendered harmless.

ID. — LEADING QUESTIONS — DISCRETION. — It is in the discretion of the trial court to allow leading questions, and, unless there is a manifest abuse of this discretion, there will be no reversal for such allowance.

ID. — ADMISSION OF IRRELEVANT EVIDENCE — TRIAL BY COURT — HARMLESS ERROR. — The admission of irrelevant evidence, when a case is tried by the court, is not ground of reversal, unless it appears that the court, in making its decision, relied on the irrelevant evidence; nor will the appellate court reverse for the admission of evidence, where it appears that the evidence is of so trifling a character that it could not have prejudiced the appellant.

DIVORCE — ADULTERY — RECRIMINATION — EXTREME CRUELTY — FINDING. — When a divorce is granted to the plaintiff upon the ground of adultery, the want of a finding on the issue of extreme cruelty set up by the answer will not cause a reversal of the judgment, when the evidence upon that issue is insufficient to sustain a finding in favor of defendant.

APPEAL from a judgment of the Superior Court of the city and county of San Francisco, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*George A. Nourse,* and *Jarboe, Harrison & Goodfellow,* for Appellant.

*T. I. Bergin,* for Respondent.

THORNTON, J.—This is an action for a divorce *a vinculo* on the ground of adultery, brought by plaintiff, Jane White, against the defendant, Lorenzo E. White. Judg-

ment was recovered by plaintiff; defendant moved for a new trial. This motion was denied, and defendant brings this appeal from the judgment and order.

The defendant denied that he was ever married to the plaintiff. He claims that their relations during the whole period of the cohabitation were those of man and mistress. On this issue the court found against him.

The court found the following facts: The plaintiff, Jane White, arrived in this state in the month of May, 1850. She was then a young widow of twenty or twenty-one years of age, with an infant of tender age. In the month of July, 1850, the defendant at the city of San Francisco engaged the plaintiff to act as housekeeper for him on the rancho San Geronimo, situate in the county of Marin, at a compensation of one hundred dollars per month. In pursuance of this engagement plaintiff went to the place of defendant, the San Geronimo ranch, to act as housekeeper, and did there act as housekeeper for defendant. Shortly after the arrival of plaintiff at the house of defendant on the ranch, defendant had illicit intercourse with plaintiff, and thereafter, in the year 1851, a child was born, the fruit of such intercourse. About the year 1853 another child was born to the parties. Between the birth of the first child and the birth of the second, the plaintiff and defendant mutually agreed to marry and did marry each other, and did thereafter live and cohabit together as husband and wife, and continued to do so from that time continuously up to a short time before this action was begun. The marriage of the parties was not performed by any clergyman or minister of the law, but was assented to and agreed upon and entered into by and between the parties themselves, and from that time to the commencement of this action, the parties have ever treated and held each other out to the community, their friends and acquaintances, as husband and wife, and they have always

been accepted, received, and treated as such by their friends and acquaintances and the community.

Other children than those mentioned were born to the parties. At the time this suit was begun, there were two children living, the fruits of the intercourse between the parties. One of these was a daughter named Nellie, born in March, 1856, and the other a son named William, born in January, 1859.

In regard to the issue of the marriage, it is clear that there was never any promise to marry made between the parties, either by present words (*per verba de præsenti*), or by words in the future (*per verba de futuro*).

But it is urged on behalf of plaintiff that the evidence shows cohabitation and repute sufficient to establish a marriage. Such seems to have been the view of the case taken by the court below.

That a marriage may be inferred from cohabitation seems to be the settled law of most countries. · The law of Scotland is set forth, and the cases on this subject are collected and commented on, by a learned and distinguished writer, Patrick Fraser, LL. D., in his able work on the law of Scotland regarding the relation of husband and wife. (See Fraser on Husband and Wife, c. 8.)

The law is thus stated in the initial sentence of the chapter just referred to: "If a man and a woman cohabit together as husband and wife, and are held and reputed by their neighbors and friends as married persons, they are *presumed* to have entered into marriage." The learned author adds to the above by way of explanation, that "cohabitation and repute do not make marriage; they are merely items of evidence from which it may be *inferred* that a marriage had been entered into."

The facts in evidence must be such as to justify the inference that matrimonial consent had been interchanged between the parties, for the matrimonial contract is formed by consent, and consent alone. (See 1 Fraser on Husband and Wife, 399.)

Lord Cranworth, in his judgment in the case of *Campbell* v. *Campbell*, L. R. 1 Sc. & Div. App. 200, 201, a Scotch appeal case, thus expresses himself on this subject: "Marriage can only exist as the result of mutual agreement. The conduct of the parties, and of their friends and neighbors, in other words, *habite and repute*, may afford strong, and in Scotland, attending to the laws of marriage there existing, unanswerable, evidence that at some unascertained time *a mutual agreement* to marry was entered into by the parties passing as man and wife. I cannot, however, think it correct to say that *habite* and repute in any case make the marriage; . . . . but I prefer to say that *habite* and *repute* afford, by the law of Scotland, as indeed of all countries, evidence of marriage, always strong, and in Scotland, unless met by counter-evidence, generally conclusive."

Lord Westbury observes in the same case as follows: " Exception may possibly be taken to some few words occurring in one of the judgments [referring to a judgment in the court below] which represents cohabitation with habit and repute as a mode of contracting marriage. Perhaps it may not be strictly correct to say that it is a mode of contracting marriage. It is rather a mode of making manifest to the world *that tacit consent* which the law will infer to have been already interchanged. If I were to express what I collect from the different opinions on the subject, I should rather be inclined to express the rule in the following language: 'That cohabitation as husband and wife is a manifestation of the parties having consented to contract such relation *inter se*. It is holding forth to the world by the manner of daily life, by conduct, demeanor, and habit, that the man and woman who live together have agreed to take each other in marriage, and to stand in the mutual relation of husband and wife; and when credit is given by those among whom they live, by their relatives, neighbors, and acquaintances, to these representa-

tions, and their continued conduct, then habit and repute arise and attend upon the cohabitation. The parties are holden and reputed to be husband and wife; and the law of Scotland accepts this combination of circumstances as evidence that consent to marry has been lawfully interchanged. Probably, therefore, in the correct expression of the law, it would be more proper to say that cohabitation with habit and repute is a mode of proving the fact of marriage,— rather a mode of contracting marriage.'" (L. R. 1 Sc. & Div. App. 211.) To the same effect is the opinion of Lord Moncrieff in *Lapsley* v. *Grierson,* 8 Dow, 61, and in *Lewis* v. *Mercer,* 2 Dow, 966.

The same rule is recognized by the law of England. (See *Goodman* v. *Goodman,* 28 L. J. Ch. 745; *Plunkett* v. *Sharpe,* 1 Lee, 441; *Bond* v. *Bond,* 2 Lee, 45; *Diddon* v. *Fancit,* 3 Phill. 581; *Harvey* v. *Harvey,* 2 W. Black. 877.) See Starkie on Evidence, 4th ed., 45, where the doctrine is explained. The observations of Starkie are quoted in 1 Fraser on Husband and Wife, 397. See also remarks of Lord Cranworth in L. R. 1 Sc. & Div. App. 199, 200. Fraser states that the rule is acknowledged to a limited extent in Code Civil of France, in relation to the legitimacy of children. (Fraser on Husband and Wife, 397, 398.)

The proof of marriage by cohabitation and repute has been recognized in many cases in the United States; as in *Fenton* v. *Reed,* 4 Johns. 52; 14 Am. Dec. 244; *Clayton* v. *Wardell,* 4 N. Y. 230; *Jones* v. *Hunter,* 2 La. Ann. 254; *Barnum* v. *Barnum,* 42 Md. 251; *Cargile* v. *Ward,* 63 Mo. 501; *Foster* v. *Harley,* 8 Hun, 68; *Bicking's Appeal,* 2 Brewst. 202; *Purcell* v. *Purcell,* 4 Hen. & M. 512; *Brinkley* v. *Brinkley,* 50 N. Y. 197, 198; *Hynes* v. *McDermott,* 10 Daly, 428; 82 N. Y. 46; 91 N. Y. 451; *Badger* v. *Badger,* 88 N. Y. 554; 42 Am. Rep. 263; *Van Tuyl* v. *Van Tuyl,* 57 Barb. 227; *Rose* v. *Clarke,* 8 Paige, 580–582.

That a marriage in this state may be established *per verba in præsenti,* or by a contract *per verba de futuro, cum subsequente copula,* was recognized in *Estate of Mc-Causland,* 52 Cal. 577. The contract characterized as entered into *per verba de futuro* is only evidence of marriage as proving the requisite matrimonial consent. Such consent is essential to every marriage (1 Fraser on Husband and Wife, 415), and prior to the adoption of the Civil Code in this state, consent alone constituted marriage. The law at that time was correctly expressed by the Latin words, "*Consensus non concubitus facit nuptias.*" As cohabitation and repute are only a mode of proving the required consent, and thus establishing marriage, there is no reason why the rules above stated regarding cohabitation and repute did not obtain in this state during the greater part of the period of the cohabitation of the parties to this action.

The evidence in this case plainly shows, and it is so found, that the intercourse between the parties was in its beginning illicit and meretricious, and it is contended,— 1. That it is presumed to continue illicit and meretricious until such presumption is overcome by distinct proof of marriage; and 2. That mere continued cohabitation and reputation of marriage create no presumption of a subsequent marriage in such case.

With regard to this contention, we think it may be considered as sound and settled law that as regards the cohabitation of a man and woman, not shown to have been in its origin illicit, the presumption is, that it is lawful. (Per Lord Eldon in *Cunningham* v. *Cunningham,* 2 Dow, 482; per Lord Redesdale in same case.) The law always presumes, in the absence of proof to the contrary, that the conduct of men is lawful and in accordance with the rules of morality. (*Lapsley* v. *Grierson,* 1 H. L. Cas. 178.) But when the intercourse was illicit from the beginning, in the absence of evidence from which a change to the matrimonial relation may be

LXXXII. CAL.—28

inferred, it is presumed to continue. The state of illicit intercourse is presumed to continue until the evidence shows that the intercourse of the parties has become matrimonial. The above, we think, is the meaning and extent of the decision in the case of *Cunningham* v. *Cunningham* (known as the Balbougie case, above cited). No greater change than that above indicated is required. There are some expressions in opinions in the cases of *Cunningham* v. *Cunningham,* and *Lapsley* v. *Grierson,* which seem to go further. But on a particular examination of the above cases, it is manifest that the learned court that decided those cases did not intend to hold that in the case where the intercourse in its inception was illicit, that that circumstance prevented the establishment of the marriage *status* by the subsequent conduct of the parties showing a general, undivided, and uniform habit and repute that they had interchanged the requisite matrimonial consent. In each of these cases the whole facts, as to the lives and conduct of the parties, were examined to see if they did not prove a marriage by habit and repute, and it was held insufficient because the repute was not general and uniform, but singular and divided.

The opinions in the cases above referred to were examined in *Campbell* v. *Campbell* (known as the Breadalbane case), L. R. 1 Sc. & Div. App., and the language of the opinions in them explained, and the conclusion there reached was, that though the connection was in its beginning illicit, yet the subsequent conduct of the parties might be such as to give satisfactory proof by habit and repute that the married *status* had been assumed. Three eminent law lords discussed the question, and reached the conclusion above stated. In the Breadalbane case the controversy arose as to the legitimacy of a son of James Campbell, who eloped with the wife of one Ludlow in 1780 or 1781. Ludlow died in 1784. Up to that time no marriage could take place. The court held that the

evidence proved that after that time, and during the life of James Campbell, the habit and repute was all uniform and undivided, and established a marriage between Campbell and the former wife of Ludlow.

The change must be such as is above pointed out. This must be so when the connection in its origin is illicit, and there is no impediment to the marriage. There was none in this case, nor in the Balbougie case. In the case before us, as in the Balbougie, there was merely illicit cohabitation. Surely there must be a change from mere illicit cohabitation, or a marriage cannot be said to be proved, since illicit cohabitation cannot establish a marriage. There must be a change operated by a cohabitation which the law regards as licit, and such change may be evidenced by cohabitation and reputation.

In the case of *Lapsley* v. *Grierson* and in the Breadalbane case, when the connection began, one of the parties, the woman, had a husband living. In the Breadalbane case, the marriage was not contended for during the lifetime of Ludlow, the husband. He died in 1784, and the parties continued to cohabit from that time until the death of James Campbell in 1806, and during this period from the death of Ludlow to the death of Campbell, and undoubtedly from 1793 to 1806, the woman Eliza Marie Blanchard was received and treated as his wife by his family and friends and all their acquaintances.

There was evidence in the Breadalbane case tending to show that there had been a formal marriage celebrated in 1781 or 1782, and some evidence that Eliza Marie Blanchard was recognized by Campbell's family as his wife, and it was in regard to this it was argued that there was a change. It was said that Campbell was deceiving his family and friends by passing the woman off as being his wife, and leading his relatives and friends to believe that she was his wife.

It was said that this system of deception continued

during the entire period of the cohabitation of Campbell with the woman.

And on this it was argued that as there was no change in this system of deception, there was no evidence which operated a change and showed cohabitation and repute, and therefore no marriage was proven.

It was in thus regarding the case, or in regarding the conduct of the parties as the same whether before or after the death of Ludlow, that it is stated in the head-note that the court held that the change in the character of the connection from adulterous to matrimonial need not be indicated by any public act or by any observable change in the outward demonstration.

It cannot be seen how such a proposition can be true, unless the public acts and outward demonstrations were the same before as after the removal of the impediment to the marriage by the death of Ludlow. If the conduct of the parties and their treatment and reception by their friends and relatives had been such before the death of Ludlow, as would, but for Ludlow's being alive, have shown a sufficient habit and repute to evidence marriage, the continuance without change of the same conduct, reception, and treatment, after Ludlow had died, might also prove a marriage between the parties. In this view, what is stated in the head-note is correct, and only in this view, for if the conduct and treatment and reception of the parties before the death of Ludlow had not shown cohabitation and repute, then necessarily after Ludlow's death there must have been a change in the conduct, treatment, and reception of the parties to have evidenced a cohabitation and repute which would establish a marriage.

We do not think that the court laid down the proposition announced in the head-note above referred to, for the opinions of the judges do show that there were public acts and outward demonstrations of parties from which habit and repute could have been inferred. This

is plain from the lord chancellor's opinion, for after saying that taking the rule to be settled by the case of *Cunningham* v. *Cunningham*, that an illicit connection at the beginning can only be changed in character by some undoubted and open act of the parties, he proceeds to consider whether the circumstances of the case before him were not sufficient to establish a marriage between James Campbell and Eliza Marie Blanchard, and concludes that they did. To the same effect is the argument of the other learned judges, lords Cranworth and Westbury. What they do find in the evidence is uncontradicted and open acts of the parties which show cohabitation and repute, and a marriage will be plainly seen on a perusal of the discussions of the evidence in the case by the learned law lords. It cannot be perceived how repute can be established in such a case except by the open, undisguised, and undoubted acts of the parties, which are visible to outsiders. As reputation is no more than hearsay derived from those who had means of knowing the fact (1 Starkie's Evidence, 4th ed., p. 40), how can the means of knowledge be derived from anything other than the acts of the parties, and how can anything be known by others from the acts of the parties, unless they are open and visible?

There are many cases in which it is held that when the connection between the parties is illicit, the presumption will be that the relation continues as it began. (*Floyd* v. *Calbert*, 53 Miss. 40, 46; *Runndle* v. *Pegram*, 53 Mass. 756; *Badger* v. *Badger*, 88 N. Y. 546; 42 Am. Rep. 263; *Barnum* v. *Barnum*, 42 Md. 297; *Foster* v. *Hawley*, 8 Hun, 68; per Lord Campbell in *Queen* v. *Millis*, 10 Clark & F. 749; *Hunt's Appeal*, 68 Pa. St. 294; *Physick's Estate*, 2 Brewst. 179; *Williams* v. *Williams*, 46 Wis. 478; 32 Am. Rep. 722; *Dysart Peerage Case*, L. R. 6 App. C. 539, per Lord Weston.)

It is a disputed question whether the presumption here referred to is one of law or fact. The decisions

leave it in doubt. In *Cargile* v. *Wood*, 63 Mo. 511, 514, an instruction in which it was stated that the presumption was one of law was approved. In *State* v. *Worthingham*, 23 Minn. 536, it is held not to be a presumption of law but one of fact. We find but one case (*Cargile* v. *Wood*, 63 Mo. 511, 514) where it is held distinctly a presumption of law. Bishop, in his work on Marriage and Divorce, says it is a presumption of fact. (See 1 Bishop on Marriage and Divorce, secs. 506, 507 a, 509, 513.) Certainly a condition of things once existing is presumed to continue. (*Eames* v. *Eames*, 41 N. H. 177.) The distinction between a presumption of law, and one of fact or an inference from facts (Code Civ. Proc., sec. 1958), is sometimes very thin, but treating the question arising on the testimony here as one of fact, it is both logical and just to hold that a connection illicit in its origin will be presumed to continue to be so until some change is established by evidence. Whatever be the character of the presumption, "it cedes to a contrary probation." In fact it is not necessary to decide here whether the presumption is one of law or of fact, for in either case it is rebuttable.

We think it may be safely held that the law will presume intercourse from cohabitation, and where the illicit cohabitation continues, that the law will presume illicit intercourse.

It seems to be well settled that the repute which with cohabitation will be proof of marriage must be uniform and general, not divided and singular. (*Cunningham* v. *Cunningham*, 2 Dow, P. C. 482; *Jones* v. *Hunter*, 2 La. Ann. 254; *Hamilton* v. *Hamilton*, 1 Bell's Appeal Cases, 736; 9 Clark & F. 327; *Commonwealth* v. *Stump*, 53 Pa. St. 132; 91 Am. Dec. 198; *Barnum* v. *Barnum*, 42 Md. 297.)

If repute lacks uniformity and is divided, then such repute cannot prove a marriage. Let us look to the evidence here on this matter of repute.

It should be stated here that a change from illicit to licit or matrimonial relations may occur and be satisfactorily established, although the precise time or occasion cannot be clearly ascertained. (*Badger* v. *Badger*, 88 N. Y. 554; 42 Am. Rep. 263; *Caujolle* v. *Ferrie*, 23 N. Y. 90.) Such seems to have been the opinion of the judges who decided the Breadalbane case.

We proceed to the consideration of the evidence of this case.

The testimony shows that the connection between the plaintiff and defendant began in 1850. The parties were then living on the San Geronimo ranch in Marin County. The defendant came from that place to San Francisco in July, 1850, where defendant met plaintiff, and after an acquaintance of not more than a week he engaged her to go and live with him on the ranch as housekeeper. She was a young widow with one child, and had come to San Francisco from Australia. The defendant was about the same age. She went over to the ranch with him in the month mentioned above. The house occupied by the parties there had two rooms, one of which was used as a kitchen. The defendant slept in the kitchen, and the other room was given up to plaintiff. The illicit intercourse commenced within a week after plaintiff reached the ranch, and continued for a period which cannot be definitely designated. In 1882 the defendant quit living with plaintiff. In 1851 a child, the fruit of the intercourse of the parties, was born. Another was born in 1853. A third child was born at Corte Madera, in Marin County, and a fourth at Petaluma in January, 1859. The plaintiff testifies that she was his wife from the beginning; that after the birth of the first child defendant said to her that before God and man she was his wife, under the laws of California. Defendant denies that he ever said so. There was never any formal ceremonial marriage between them. In a deposition, which appears in the record, the following question was put to

her by counsel for defendant: "Then what I understand you to say is, that the way that you became his wife was by sleeping with him and being called wife by him in the presence of others?" To which she answered: "Yes, sir." She subsequently added to this: "In society, what little we go, he has always called me his wife." She states that White introduced her to his acquaintances as his wife. Defendant admits that he did at times, after the birth of his daughter Nellie in 1856, introduce her as his wife; that he did so when he found himself in a position that he had to say something; when she was with him, and he had to say something for the protection of his children, he had introduced her as his wife; that he sought no opportunity to do so, and had not gone into society with her. The plaintiff states that he introduced her to his father and mother as his wife. Defendant testifies that he made them acquainted some way,—he could not tell how,—that he treated plaintiff well, that they were living together, and he left his parents to infer the relation between them. Mrs. B. F. White, mother of defendant, testified on this point. She and her husband (father of defendant) came to this state from New York, at defendant's expense. They lived in defendant's home for some months when he kept a hotel at Albion in Mendocino County, arriving there in 1866. A daughter came with them. The mother testifies that the defendant introduced plaintiff as "the madam," and that she supposed that she was his wife, and treated her as his wife. The daughter (defendant's sister) testifies substantially to the effect. She does not remember who introduced her to the plaintiff, or how she was introduced. She supposed plaintiff was his wife; that they lived together as husband and wife; and she further states that the plaintiff was received and treated by her father and mother and her relatives as the wife of defendant. She further states that she did not remember that she ever heard defend-

ant address plaintiff as his wife. He addressed her as Jane or madam. This evidence shows that he sometimes called her wife.

On the point whether the parties were reputed to be husband and wife during the period of their connection, the evidence in regard to the period extending from 1850 to 1855 or 1856 shows a divided repute; the evidence that plaintiff was the mistress of defendant and not his wife greatly preponderating. This appears from the testimony of Dickenson, Taylor, Curran, Clingan, and Moulthrop. The evidence of the witnesses above mentioned is all one way as to the repute during the period just mentioned. The only contrary evidence, which is of small consequence, comes from the witness Clingan, that the women around Corte Madera called her Mrs. White. There was no other repute than the above during the time they lived in Marin County, from which they removed to Mendocino County in the spring of 1858, at which time they went to Long Ridge in that county. From this place they removed to Albion, in the same county, in September or October, 1861, where they remained until October, 1868, when, in the month just named, they came to San Francisco and have resided there together until August, 1882, when the defendant quit living with plaintiff. After the parties removed to Long Ridge, in the spring of 1868, we hear nothing of any reputation that they were living together as man and mistress.

We rarely collate the evidence in regard to its sufficiency to justify the decision; but we propose to do so in this case, by giving the substance of the testimony of each witness bearing on the point. A. W McPherson knew the parties as Mr. and Mrs. White from 1861. They addressed each other as Mr. and Mrs. White. They were introduced to him as Mr. and Mrs. White. H. H. Hundley has known the parties since 1866. They were commonly known as Mr. and Mrs. White; has known the

children during the same period by the names William White and Nellie White.

Patrick Cleary has known the parties since 1862, recollects one time they visited his family; may have visited his family other times; when they made this visit he lived in the city and they lived at Albion. He visited them as Mr. and Mrs. White. They behaved toward each other as any other man and wife behaved; never heard anything to the contrary, except a rumor about two years ago. (This would be about the time of the separation of the parties, which was in August, 1882; the witness gave his evidence at the trial which took place in December, 1884.)

Thomas Pollard has known defendant about twenty years, and plaintiff fourteen or fifteen years. They are known as Mr. and Mrs. White; have known the children about fourteen years; they go by the name of White. He was asked to state to the court how the plaintiff and defendant have been commonly reputed,—as husband and wife or otherwise,—to which his reply was, "I never knew anything to the contrary till recently." This witness stated that he lived with his family in this city, right across from White; that White never took plaintiff to visit his (witness's) family at his house; that he has "no direct knowledge of White's ever taking her into any company to visit the neighbors or anything of the sort."

George M. Smith stated that he had known White since 1861; had known the plaintiff since 1862 or 1863; knew them as Mr. and Mrs. White. They had two children; he knew them by the names Nellie and Willie White; has heard defendant address plaintiff as madam; could not swear that he had heard White call her wife or Mrs. White in speaking to or of her.

The next witness was Mrs. Smith, the wife of the former witness. She met the plaintiff about twenty years ago (this testimony was given on the trial in December, 1884), and Mr. White about twenty-two or

twenty-three years ago. She met them at Albion, in Mendocino County. She lived near them; knew the children Nellie and Willie; sometimes she had seen plaintiff and defendant half a dozen times a day,—sometimes more, sometimes less. So far as she knew, they were known at Albion as Mr. and Mrs. White. She had heard the defendant call plaintiff the madame, my wife, and Jane. She was not very sure of any particular instance when she heard defendant call plaintiff his wife. She was very positive she had heard White call plaintiff his wife, and more than once, and this in addressing her.

The next witness is Mrs. Helen M. Kimball, who was the sister of defendant; has known the plaintiff since 1866; became acquainted with her at her brother's (White's) house, in Albion, when he was keeping the hotel there. She was introduced to her; cannot tell how she was introduced to her; was introduced by her brother. He usually addressed her as Jane, and in speaking of her he called her madam; and in speaking to the children " your mother." She does not remember that her brother introduced plaintiff to her as his wife; does not remember that he told her she was his wife. Her understanding was, that she supposed she (plaintiff) was his wife. They lived as husband and wife. She and her father and mother lived in the house with them eight months. She testifies further that plaintiff was received and treated by her father and mother (father and mother of defendant also) and their relatives as the wife of defendant. She does not remember hearing her brother speak of plaintiff as Mrs. White. She thought it a little peculiar that he addressed her as Jane or madam. She does not know that she spoke of it while living at the hotel. While they lived there they regarded her as White's wife.

Mrs. W. L. Jenny testified that she had known the parties nineteen or twenty years. She was introduced

to plaintiff by a lady named Cunningham. Mr. White
was not present. White never introduced plaintiff to
her; he always called her the madam; knew the chil-
dren. They went by the names of Nellie White and
Willie White. She had not been to their house for
twenty years; before that used to call there once in a
while; have taken dinner there a good many times; Mr.
White was present. The witness was a married woman.
She always thought the parties acted toward each other
as husband and wife. She never heard him call her
wife. The children addressed Mr. White as their father,
and the plaintiff as their mother.

George W. Le Mont had known the parties some ten
or twelve or fourteen years; had frequently taken lunch
at White's house. He always judged from their conver-
sation that they were man and wife. He and his wife
had visited their house together. They always appeared
like a family living in harmony.

Miss Annie Manning had known the parties about
four years. She thinks they acted toward each other as
husband and wife. They acted toward their children as
a father and mother should.

Jerome B. Ford became acquainted with defendant at
Albion some time between 1855 and 1865; was at the
hotel in Albion frequently; had never been introduced
to Mrs. White, and never spoke to her. They were said
to be then Mr. and Mrs. White,— L. E. White and wife;
had known the parties four years next March. Mr.
White used to speak to plaintiff as any man would to his
wife; could not say what name he called her.

B. H. Madison testified that he had known Mr. White
ten or twelve years; had visited the house several times
on business, and thinks he once made a social call with
his wife and eldest daughter. Both White and plaintiff
were present. He called her Mrs. White in the presence
of defendant and of his wife and family.

James Brett had heard defendant speak of plaintiff as

his wife; his (witness's) wife addressed plaintiff, in presence of defendant, as his wife.

James Kenny had known the parties for twenty-five or twenty-six years; had known them at Cuffey's Cove; he believed they had lived on a ranch there for five or six years as Mr. and Mrs. White. He was on friendly and social terms with them during their residence at Cuffey's Cove. The reputation of their relation while they resided there was that of man and wife, so far as he ever heard. He first called at defendant's house, then Mr. White introduced her; but not sure defendant was accustomed to speak to me and to others in my presence of plaintiff as Mrs. White. If I remember right, defendant introduced me to plaintiff as his wife; but he has no distinct recollection of the introducing. While the parties lived at Cuffey's Cove, heard a rumor that they were not married.

Eugene Brown had known defendant a little over twenty years; the plaintiff a little less, while they resided in Mendocino County. He knew the reputation in the community in which the parties lived, — of the relation they bore to each other since he first knew them, and up to the time he gave his testimony. The reputation was, that they lived together as married people, in Mendocino County, and had never heard anything to the contrary until this divorce case came up. He did not think he had confounded his impression of the facts with public reputation thereof; heard her called his wife once or twice in Mendocino County; had heard her called Mrs. White frequently, but does not distinctly remember of hearing her called Mrs. White at the Albion. He could not remember who of the people at the Albion he had heard say that plaintiff and defendant were husband and wife.

Mark D. Gray testified that he saw plaintiff at the Albion once, in 1877. Defendant introduced plaintiff as the madam.

There is evidence here, at least since 1861, of cohabitation and repute which tends to show a marriage between the parties. Such cohabitation and repute "is a mode," as said by Lord Westbury in *Campbell* v. *Campbell, supra,* "of making manifest to the world that tacit consent which the law will infer to have been already interchanged." (L. R. 1 Sc. & Div. App. 211.) The repute, which was nearly all one way prior to 1858, afterward underwent a change. We think the evidence tends to show that the parties had agreed to stand in the relation of husband and wife. The defendant treated the plaintiff as his wife. If he did not *in so many words* formally introduce the plaintiff to his father and mother and sister as his wife, his conduct convinced them that she was his wife, and, according to the testimony of the sister (Mrs. Kimball), she and the father and mother of defendant received plaintiff and treated her as defendant's wife. They did not go much into society, but in the contracted circle into which they went they were regarded and treated as husband and wife. This treatment was induced by the conduct of defendant and plaintiff. We do not think that the law requires the formal introduction by the husband of the woman as his wife to each member of the social circle into which they go, but that his conduct should justify her reception in such circle as his wife. The defendant's styling the plaintiff the madam might well induce persons to whom he so introduced her, or to whom he thus spoke of her, to believe that she was his wife. He admits that he did introduce her as his wife, and this is evidence that he sometimes spoke of her as his wife. He explains the introduction of her as his wife as a mode of shielding his children, but such mental reservation cannot be considered of much weight. The credit to be given to such reservation, and the weight and value of the testimony, are matters for the consideration and determination of the court below. That tribunal weighed the

testimony and found a marriage, and there is not such a lack of testimony here as will authorize this court to say that the evidence was insufficient to justify the conclusion of the trial court.

But it is urged that inasmuch as the divorce is sought here on the ground of adultery, that a marriage cannot be proved by cohabitation and repute, and to sustain this, two cases are referred to, decided in this court: *Case* v. *Case*, 17 Cal. 600; *People* v. *Anderson*, 26 Cal. 133.

In the latter case, which was an indictment for murder, a witness was called for the people, whose competency was challenged by the defendant on the ground that she was his wife, and an attempt was made to show that such was the relation of the witness to the defendant by cohabitation and repute. The court, per Sanderson, C. J., said that the general rule is, that such evidence was admissible (citing several authorities to sustain this proposition), and then adds: "Actions of *crim. con.*, divorce, indictments for bigamy, and like cases, where the marriage is the foundation of the claim to be enforced or the crime to be punished, are exceptions to this rule." (*People* v. *Anderson*, 26 Cal. 134.)

*Case* v. *Case*, 17 Cal. 600, was an action for divorce on the ground of adultery. The only evidence of marriage between the parties to the action was that of cohabitation and reputation. It appeared that defendant had, after this cohabitation, married another person. The evidence of cohabitation and reputation was objected to, and this court held it inadmissible. The court, per Cope, J., said: "We think that, under the circumstances, an actual marriage should have been proved. The general rule that in actions of this nature the marriage may be inferred from the cohabitation of the parties, we do not understand to be applicable. We cannot indulge this inference without presuming that the defendant has been guilty of bigamy, and the fact that it makes such

a presumption is sufficient to repel it. In the absence of criminative proof, it is never to be supposed, as a matter of legal presumption, that a person has violated the criminal law, and the presumption in favor of innocence, says a learned writer, is not confined to proceedings instituted with a view of punishing the supposed offense, but holds in all civil suits where it comes collaterally in question." The learned justice then proceeds to quote two extracts from Bishop on Marriage and Divorce, and refers to *Rex* v. *Twining*, 2 Barn. & Adol. 386, and *Clayton* v. *Wardell*, 4 N. Y. 280.

The cases cited sustain the decision of the court in *Case* v. *Case*, 17 Cal. 600. But it will be observed that in both cases there had been an actual marriage, by which, if there was a prior actual marriage, the party would have been guilty of a violation of the criminal law from having committed the offense of bigamy. *Case* v. *Case, supra*, and the two cases, go no further than what is just above pointed out, and they proceed on the ground that where a presumption of marriage is met by the presumption of innocence, which the defendant on his trial for bigamy has a right to invoke, the weaker presumption gives way to the stronger, which is the presumption of innocence. This question is considered and passed on in a criminal action in the *People* v. *Feilen*, 58 Cal. 218; 41 Am. Rep. 258; and is thoroughly discussed in *Jones* v. *Jones*, 45 Md. 157, 158; 48 Md. 397, 398 et seq.; 30 Am. Rep. 466. In every case above referred to, the strife was between two marriages; the antecedent marriage being one attempted to be made out by the presumption or inference from cohabitation and repute, and the other an actual marriage. (See *Taylor* v. *Taylor*, 1 Lea, 571, in 5 Eng. Ecc. 454; *King* v. *Inhab. of Twining*, 2 Barn. & Adol. 336; *Poultney* v. *Fairhaven*, Brayt. 185; *Senser* v. *Bower*, 1 Pa. 450; *Wyatt* v. *Wyatt*, 44 Ill. 473; *State* v. *Hodgkins*, 19 Me. 158, 159; 36 Am. Dec. 742.)

The presumption of innocence will only arise when

there is evidence brought to show that a party has been guilty of a penal offense, and this, we think, is the meaning of the portions of the text of Best on Presumptive Evidence, 64, and Bishop on Marriage and Divorce, sections 324, 325, referred to in *Case* v. *Case*, 17 Cal. 600. The language in the work on Presumptive Evidence denotes that a violation of the criminal law is referred to. The author says that the presumption of innocence is not confined to proceedings for punishing the supposed offense, but holds in all civil suits where *it* comes collaterally in question. What can *it* refer to but to the offense which is punishable? It is evident that Bishop in the extract made in the opinion (17 Cal. 620, 621) refers to adultery as an offense against the public law. He speaks of the benign influence of the presumption of innocence, "in order to prevent the suspicion that an offense has been committed." We cannot find this section 325 in the last edition of Bishop on Marriage and Divorce. In section 443 (vol. 1) Bishop states the rule thus: "The marriage has been required to be proved by evidence other than cohabitation and repute in action for criminal conversation, and on *indictments* for polygamy, for *adultery*, for incest, and for loose and lascivious cohabitation." (Citing cases which sustain this as to adultery.) It will be remarked that he confined this rule to *indictments for adultery.* This could only be so where adultery was an indictable offense.

Now we have no statute, and never have had one, in this state making mere adultery a penal offense. It was not a penal offense at common law. (4 Bla. Com. 65.) The statute in this state makes the living in open and notorious cohabitation and adultery an offense. (See Stats. 1871–72, 380; *People* v. *Gates*, 46 Cal. 52.) Section 123 of the act concerning crimes and punishments only refers to adultery between persons living within the degrees of consanguinity within which marriages are declared by law to be incestuous and void.

We think that the weight of authority shows the rule to be that evidence of cohabitation and repute is admissible to show a marriage in all cases where there is no question of a public offense involved. The statement of the rule in *People* v. *Anderson*, 26 Cal. 133, as regards actions for divorce, is a mere *dictum*, outside of the case, and is not sustained by the decided cases or by the law.

There are cases which tend to show that such evidence is admissible in a civil action when it proved the commission of a public offense. (*Archer* v. *Haithcock*, 6 Jones, 421–423; *Lund* v. *Ewing*, 5 J. J. Marsh. 464, 491.) In *Jewell* v. *Jewell*, 1 How. 224, the evidence seems to have been admitted by the lower court without objection, and the point was not distinctly made in the supreme court. In the North Carolina case it is said that the only exceptions to the rule are an indictment for bigamy and an action for criminal conversation. The court expressed the opinion that what is competent evidence in one case ought to be so in another. In this case the evidence was admitted in an action of ejectment to defeat rights under a second marriage, though the second marriage was formally solemnized and proved by direct evidence. Gardner, J., in a dissenting opinion in *Clayton* v. *Wardell*, 4 N. Y. 280, expressed the opinion that such evidence should be held admissible in all cases. He said the distinction between civil actions and criminal or *quasi* criminal proceedings was established by Lord Mansfield, and has been adopted without question or investigation, apparently.

We think such evidence was admissible here, and that nothing in *Case* v. *Case* is adverse to it. The point was not decided in *People* v. *Anderson*. It was not involved in the case, and we are convinced that the *dictum* there pronounced is not sustained by authority or law.

It appears that a deposition of the plaintiff had been taken herein previous to the trial, and returned to the court below. During the cross-examination of the

plaintiff, defendant's counsel, with a view of showing
contradictory statements made by her, read to her from
this deposition several questions and answers, and in-
quired of the witness "if that was correct." "Is that
what you said then?" "Is that true?" An objection
was made to this mode of cross-examination. The
court sustained the objection, and the defendant ex-
cepted.

The court no doubt would have allowed the defendant
to put in such portions of the deposition as he might
have selected to discredit the witness. The defendant
certainly has a right to show the contradictory state-
ments. To do this, as the witness was a party to the
action, it was not necessary to call her attention to the
statements formerly made inconsistent with her state-
ments made on her then examination. Her statements
appearing in the deposition were admissions, and might
have been offered as such. The mode of cross-examina-
tion was objectionable. It consumed time in doing
what was utterly useless in asking the questions as above
stated. The court has the power, and should have it,
to control the mode of examination of a witness, pro-
vided it does not trench on the rights of a party. The
defendant might have put in portions of the deposition
to show the contradictory statements, and the court
would have allowed the plaintiff to put in the remaining
portions. The deposition was subsequently offered and
admitted. The statements which the defendant desired
to get before the court did thus get before it. In this
state of the case, conceding that the court erred in its
ruling putting a stop to defendant's mode of cross-
examination, the error was rendered harmless to the
defendant by placing the deposition before the court as
evidence, and as no injury was done by defendant, there
can be no reversal for such ruling.

It is objected that the plaintiff's counsel was permitted
to ask of the plaintiff on her re-examination a question

admitted by the court to be leading.   The allowance of leading questions, it is a well-settled rule in this state, is in the discretion of the trial court, and there should be no reversal for such allowances, unless there is a manifest abuse of this discretion.   As we find no such abuse here, there is no error.

The admission of the mortgage of plaintiff and defendant to W. B. Spears, over the objection of defendant that it was irrelevant, is not error.   When the court tries the case, this court never reverses for the admission of irrelevant evidence, unless it appears that the court, in making its decision, relied on the irrelevant evidence.   It does not appear herein that the court relied on such evidence.

Conceding that the admission of the acknowledgment of the mortgage was erroneous, the court is of the opinion that the evidence is of so trifling a character that it could not have prejudiced plaintiff, and it declines to reverse for such ruling.

It is contended that there is no finding on the issue of extreme cruelty, which was pleaded by defendant in recrimination.

The court is of opinion that the evidence on this issue was insufficient to have sustained or justified a finding by the court below of extreme cruelty by plaintiff to defendant.   The only evidence worthy of consideration is that regarding the firing of a pistol behind defendant by plaintiff many years before the former quit living with the latter.   From this circumstance, it is evident that defendant did not regard himself in peril or danger of any kind from plaintiff.   If he had regarded himself in danger, he would not have continued to live with her for five or six years after the firing of the pistol occurred.

As the evidence would not have justified a finding of extreme cruelty on the part of plaintiff, and as this court would have reversed for such a finding, as not justified

by the evidence, if it had been made, it will not reverse for want of such finding, and send the cause back for a finding on that issue.

Judgment and order affirmed.

McFARLAND, J., SHARPSTEIN, J., and PATERSON, J., concurred.

Fox, J., concurring.—I concur in the judgment. I think that the first part of the second finding negatives every allegation of extreme cruelty made by the defendant, and that a separate finding upon that subject was unnecessary. The other errors of law, if they were errors, are of so insignificant a nature as that they could not possibly have changed the result.

It is true that consent lies at the foundation of every marriage, and without consent there can be no marriage. But as was said in *Campbell* v. *Campbell*, cited by Mr. Justice Thornton, there are cases in which a tacit consent will be inferred. Even under our code it will be presumed "that a man and woman deporting themselves as husband and wife have entered into a lawful contract of marriage." (Code Civ. Proc., sec. 1963, subd. 30.) And after a quarter of a century of that kind of deportment toward each other and toward the world, the parties ought to be estopped to deny such presumption. Then the conclusive presumption arising under subdivision 3, section 1962, of the Code of Civil Procedure, ought to prevail: "Whenever a party has by his own . . . . act or declaration . . . . intentionally and deliberately led another to believe a particular thing true, and to act upon such belief, he cannot, in any litigation arising out of such . . . . act or declaration be permitted to falsify it."

WORKS, J., dissenting.—I dissent. To my mind the evidence shows conclusively that these parties were never married. Cohabitation and repute may be suffi-

cient to raise a *presumption* of marriage, and if undisputed authorize a judgment to that effect. But here the testimony of both of the parties shows beyond any question, not only that the intercourse of these parties was illicit in the beginning, but that it continued to be so up to the time of their separation. The positive and direct evidence of both of the parties is, that there never was any promise or agreement to marry or to live together as husband and wife. Therefore, the evidence of cohabitation and repute, which in this case is extremely weak and unsatisfactory, cannot and should not prevail. A mere *presumption* of a marriage arising from cohabitation cannot stand as against positive evidence to the contrary by both of the parties interested.

Rehearing denied.