ARNOLD et al. v. CHESEBROUGH et al.[1]

*(Circuit Court, E. D. New York.   June 30, 1891.)*

1. HUSBAND AND WIFE—MARRIAGE—EVIDENCE—BURDEN OF PROOF.
   One who asserts a marriage as the basis of a claim at law or in equity must satisfy the court, upon the whole case, by a fair preponderance of proof, not necessarily when and where such contract was made, but that at some time and place it was made.

2. SAME—MARRIAGE—HOW PROVED—INFERENCES.
   Marriage may be proved by circumstantial evidence, by proof of the acts and declarations of the parties, of their cohabitation as husband and wife, holding themselves out to the world as such. Such course of life or declarations do not make a marriage, but are legitimate ground for inferring that there has been at some time a valid marriage contract.

3. SAME—EVIDENCE—REPUTE.
   On a disputed question as to the existence of a marriage, evidence of repute in the families of the contracting parties is admission.

4. SAME.
   On the evidence in this case, *held* that the marriage asserted by complainant was not proved.

In Equity.
*Henry Rawcliffe, (John H. V. Arnold, of counsel,) for complainant.*
*Bliss & Schley, (W. S. Logan, of counsel,) for defendant.*

LACOMBE, Circuit Judge.   This is an action brought by Leonora A. Arnold, who claims to be a legitimate daughter of Blasius More Chesebrough, against the executors and trustees under the will of his mother, Margaret Chesebrough, deceased, such will directing that, upon the death of Blasius, (an event which happened in 1866,) one equal half part of her residuary estate should be paid to his lawful issue, if any.   It is not disputed, upon the proofs, that the complainant's mother is Josephine, a daughter of Mrs. Rachel Cregier, nor that her father was Blasius M. Chesebrough.   It appears that she was born (October 9, 1857) in the house of her grandmother, (Mrs. Cregier,) in this city, and that for several years prior thereto her father and mother lived together, as man and wife, in hotels, in boarding-houses, in apartments, and also at her grand-

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

mother's. It is essential to the complainant's case, however, that the fact of a marriage between her father and mother should be shown by competent evidence, to the satisfaction of the court. The question to be determined is a question of fact, to be settled upon a consideration of all the competent and relevant evidence in the case. It is a fact which, at the close of the case, the complainant must show to be established by a fair preponderance of proof. As the evidence is being put in, the weight in either scale may vary, and such preponderance may shift from side to side, but the burden of proof which the complainant assumed when she filed her bill she must show herself able to sustain when the case is closed, or she has failed. There is no presumption of law in such a case. *Blackburn* v. *Crawfords*, 3 Wall. 186. Such presumptions of fact, or rather such unproved inferences from proved circumstances, as human experience will warrant the trier of the facts in drawing, may constantly vary, may be of greater or of less force, controlling of the final decision, or of no effect thereon, just as there may be change in the number and character of those proved facts from which it is sought to draw the inferences; and the final conclusion must be drawn with a due regard to the entire body of competent and material proof. Marriage may be proved by circumstantial evidence, by proof of the acts and declarations of the parties, of their cohabitation as husband and wife, holding themselves out to the world as sustaining that honorable relation to each other. But neither such a course of life nor such declarations make a marriage, nor do they even directly or affirmatively establish it. They may, if satisfactorily proved and sufficiently strong, be legitimate ground for inferring that there has been a valid marriage,—a contract, that is, (with or without any ceremony,) whereby, at some time and place, the parties agree together, per *verba de præsenti*, to be husband and wife, following that agreement by cohabitation as such. Whoever asserts a marriage as the basis of a claim at law or equity must satisfy the court, upon the whole case, by a fair preponderance of proof, not necessarily where and when such contract was made, but that at some time and place it was made. If it is sought to prove that fact by circumstantial evidence, the triers of the fact must first determine what circumstances are fairly proved, and then decide whether all those circumstances, taken together, constrain the mind to accept the inference that such contract was made.

Blasius M. Chesebrough, who claimed to have purchased a title of nobility in Austria, and liked to be known as "Count," is described, truthfully enough, by counsel, as a very eccentric man, bombastic, pompous, and extravagant; but this by no means completes his picture. He was under no restraint, self-imposed or otherwise; absolutely selfish; seeking pleasure in the constant gratification of his sensual appetites; reckless, roystering, dissipated; rarely completely sober; a frequenter of bawdyhouses; a bad son; a mere brute when inflamed with drink; and yet contemplating himself and his position in the community with a self-complacent conceit, which esteemed "Count" Chesebrough as something superior to mere common clav. In 1854, when he first encountered Josephine Cregier, (though some testimony would make the date 1853,) he was

about 35 years of age and she was 16. They met at Sirocco's dancing-rooms in Bond street, (Blasius having apartments in the same building,) and that same night she shared his bed. Shortly thereafter she left her mother's home, and lived with him in Bond street and elsewhere, and the testimony is uncontradicted that for weeks certainly, probably for months, they maintained a meretricious connection. It is contended by the complainant that subsequently, in 1854, they were married in the city of Baltimore, whither they made a trip for that express purpose; and Josephine herself, testifying for the complainant, gave direct evidence to that effect. Subsequently, when called by the defendants, she retracted her former statement, and testified that she was never married to Blasius M. Chesebrough in Baltimore or elsewhere. If her later testimony were to be accepted, there need be no further inquiry. Certainly, in view of her admitted perjury, the complainant cannot insist that her testimony affords direct proof of a marriage. If her evidence both ways on that point be disregarded, such proof can only be found, if at all, as a necessary and natural inference from all such circumstances as are established by the testimony of credible witnesses.

To discuss at length this testimony, extremely voluminous, and a large part of it taken under exception, is wholly unnecessary. The point to be decided is purely a question of fact. The conclusion reached, after consideration of a multitude of circumstances, peculiar to the case, would be of no value as a precedent in other cases, where the circumstances were not identical. It will be enough, therefore, to indicate, with great brevity, some of the reasons which lead to the conclusion that Blasius M. Chesebrough and Josephine Cregier were not husband and wife. The intercourse was originally meretricious, and there was no reason why Blasius should change it. Marriage was not needed as the price to be paid for the gratification of some passion. The girl had already yielded, apparently without much objection, to his solicitation, and was living with him as his mistress. That marriage was a reparation, which he ought to make her for having gratified his passion at the sacrifice of her virtue, was an idea which there is certainly no reason to suppose would ever have entered the head of Blasius Chesebrough, nor been entertained there long had it been suggested by another. Until the time when they separated, in 1858, they lived together as husband and wife, to the extent at least of sharing the same rooms, and indicating to hotel-keepers, dressmakers, servants, and others, with whom they necessarily had occasion to come in contact, that their relationship was a proper one. Standing alone, such testimony would be very strong evidence in support of an asserted marriage; but it is also the way in which man and mistress frequently live, in which it may be said they must live if they frequent respectable hotels; and, when it appears that their living thus together began illicitly, something more than mere continuance, coupled with such declarations as would make that continuance pleasant for them, is needed to support an inference that they were married. There seems to be nothing to distinguish the cohabitation which immediately succeeded the first meeting at Sirocco's from the co-

habitation which followed the month of October, 1854, when it is claimed they were married in Baltimore. There is nothing to exclude the natural inference that the former relation continued, nor to satisfactorily prove that it had been changed into that of an actual marriage by mutual consent.

The declarations of Blasius, made subsequently to their separation, may be disregarded. As to the statements that they were married, made, during such intercourse, to hotel-keepers, and to other persons, at a time when a respect for appearances called for such statements as essential to comfortable living in decent quarters, and to the contrary statements made to boon-companions or loose women, whose questions he might resent as referring to what was none of their business, it may be said that they are entitled to little weight; probably a lie one way or the other was of little matter to Blasius. Of general public recognition by acquaintances beyond those casually encountered in the vicinity of his residence, of introduction to his family, of declarations to his relations, or at least to those with whom he was on good terms, which would naturally be expected from a husband, there is no satisfactory proof. Practically the only evidence as to such declarations is that of Christian Storms.

Inasmuch as they lived together for several years, it is quite natural that the question what relation they bore to each other suggested itself to other members of his family. In such cases evidence of repute in the family is admissible. Without discussing at length the evidence of the various members of the Storms family, (other than Christian) whose source of information seems to have been their father (a gentleman who in his life-time put himself on record, under oath, as believing Blasius to be unmarried,) it is sufficient to say that the repute in the Chesebrough family was divided, and the same may be said of repute among his associates and friends. But a divided reputation is not sufficient to warrant the inference of marriage. *Clayton* v. *Wardell*, 4 N. Y. 230; *Brinkley* v. *Brinkley*, 50 N. Y. 184.

As to reputation in the Cregier family, it is to be noted that the evidence of the cousins Mrs. Irving and Mrs. Franklin, and of the sister-in-law Mrs. George W. Cregier, is principally, if not wholly, based upon what they heard from Mrs. Rachel Cregier. The same ought, perhaps, to be said of the evidence of Josephine's sister, Almira, (Mrs. Sisson,) who was but 9 years old when the intercourse began, and 12 years old when it terminated.

Rachel Cregier is deceased, but it appears that in 1859 she brought a suit in the superior court for the seduction of Josephine against Blasius, alleging that the connection between them continued between April 1, 1853, and November 16, 1857, and that complainant was born October 9, 1857, as the result of such unlawful connection; and, further, that about October 1, 1855, he enticed Josephine away from her mother's house, and kept her away two months. The case was tried on inquest, before Judge WOODRUFF and a jury. Mrs. Cregier and the sister Almira were examined as witnesses, and there was a verdict for the plaintiff

therein of $2,500, which was subsequently paid. In view of this piece of record evidence, it is difficult to see how it can be contended that there was a reputation of marriage in the Cregier family. Certainly no declarations of Rachel to that effect, nor any testimony as to the belief of others, whose information was derived from her, are entitled to much weight. She might have sought to save her daughter's reputation among other members of the family by saying she was married, but it must be assumed that she stated what she believed to be the truth when she brought the suit and testified on the trial. The complainant objected to the admission of the record and judgment roll in this seduction suit. It is well settled that, in cases of pedigree, family conduct is admissible evidence from which the opinion and belief of the family may be inferred. The judgment roll may fairly be considered competent evidence of family conduct; but if it be not, and if all evidence of the declarations of Rachel Cregier were excluded from the case as hearsay, then there would be left practically no evidence of repute in the Cregier family, except that given by Almira Sisson, which, as she was of such tender age at the time, is certainly of but little weight. Finally, though Blasius was liberally supplied with money, and after his mother's death in 1860 was a man of abundant means, Josephine never made any claim upon him during the 8 years of his life subsequent to the separation, nor for 14 years after his death did she assert any claim to the large estate which he left. Considered together, the testimony is not sufficiently strong to constrain the mind to accept it as a natural inference that the arrogant, selfish, dissolute man of 35 ever married the young girl of 16, whose feeble virtue yielded so promptly to his solicitations, who began life with him as his mistress, and who left him without any effort to obtain from him, or his estate, the support which the law secured to her if she were his wedded wife.