## WEIDENHOFT ET AL. v. PRIMM.

APPEAL AND ERROR—RECORD—ARRANGEMENT OF, AND NUMBERING PAGES — DISMISSAL — BILL OF EXCEPTIONS — MOTION FOR NEW TRIAL—ESTATES OF DECEDENTS—PROCEEDING TO DETERMINE HEIRSHIP—APPEAL—WITNESSES—EVIDENCE—COMPETENCY—MARRIAGE—CONTRACT—SUFFICIENCY OF EVIDENCE TO ESTABLISH—PRESUMPTION OF MARRIAGE FROM COHABITATION—ILLICIT COHABITATION.

1. It is only after an order has been made requiring the rearrangement and numbering of the pages of the transcript and papers composing the record, and a non-compliance with such order, that the proceeding in error may be dismissed in the discretion of the court, for a non-observance of the rules as to arranging and numbering the pages of the record.

2. The motion for new trial is properly in the record, where a copy thereof appears in the bill of exceptions, which is properly certified by the judge as a true bill and made a part of the record, and the bill is enumerated in the clerk's certificate as one of the original papers filed in the case and transmitted to this court pursuant to the order requiring the original papers to be sent up.

3. A final judgment of the district court in a proceeding to ascertain and determine the heirship, ownership and interest of claimants to the estate of a decedent, under Sections 4835 and 4836, Revised Statutes 1899, is reviewable on error.

4. The provision of Section 4836, that "such determination shall be final and conclusive in the administration of the estate," does not prevent an appeal, but is to be construed as concluding the parties by a final determination in the proceeding, which, in case of an appeal, would only occur when finally decided in the appellate court.

5. One claiming to be the widow of a decedent is not a competent witness to prove marriage as against the mother and sister of decedent claiming as heirs, in a proceeding to determine the heirship to decedent's estate; but her testimony is competent where she is allowed to testify without objection, though in determining its weight the fact that the statute makes her an incompetent witness should be considered.

6. In a proceeding to determine heirship, one claiming to be the widow of decedent testified that after the decedent and herself had lived together as man and wife for some time

illicitly, a contract of marriage was entered into through the reading in their presence of the marriage ceremony of the Episcopal Church by one not authorized to perform the marriage ceremony, and each answering the questions appearing therein, but whether such questions were answered in the affirmative or negative was not stated; and when the claimant was asked as a witness if she then took the decedent as her husband and he took her as his wife, she testified, "We answered all the questions contained in the marriage ceremony of the Episcopal Church." *Held,* that such testimony was insufficient to establish a mutual contract of marriage, as the manner in which the ceremonial questions were answered could not be assumed.

7. Though, where a man and woman live together, treating each other as man and wife, hold each other out to the world as such, and so conduct themselves toward each other and the community as to gain therein a general and uniform reputation as being husband and wife, that is sufficient to create a presumption that they have been lawfully married, it does not directly or affirmatively establish a marriage. If satisfactorily proved and sufficiently strong, the facts may be legitimate ground for inferring a valid marriage.

8. When the cohabitation between a man and woman is shown to have been illicit in the beginning, the presumption is that it continues to be illicit until the contrary is established.

9. The general reputation in the community where they reside as to whether or not a man and woman who have lived together are or were man and wife is competent evidence on the question of their marriage; but to be of any value as evidence, such reputation must be general and uniform.

10. The evidence held insufficient to establish an alleged common law contract of marriage between a decedent and a claimant to his estate as widow, where it appeared that their cohabitation was confessedly illicit in the beginning and continued so for some time prior to the alleged contract; that the claimant had been held out as the wife of decedent the same before as after the alleged contract; that, though claimant testified to a reading by her mother in their presence of the Episcopal marriage ceremony and their answering all the questions, she did not state how the questions were answered; that, notwithstanding decedent usually introduced claimant as his wife, they were not generally or uniformly reputed to be married in the community where

they lived, but their relations were generally regarded as
illicit; and other acts and declarations of the parties were
shown inconsistent with a marriage contract.

[Decided March 9, 1908.]                    (94 Pac., 453.)

ERROR to the District Court, Fremont County, HON.
CHARLES E. CARPENTER, Judge.

Upon a proceeding to determine heirship to the estate of
Julius A. Schuelke, deceased, Lola Small Schuelke Primm
claimed the estate as widow of the decedent, as against
Emilie Weidenhoft, mother, and Johanna Schuelke, sister
of the decedent. Judgment was rendered in favor of the
former and the latter—the mother and sister—prosecuted
error. The facts are stated in the opinion. The case was
heard upon motion to strike the bill of exceptions and dis-
miss the petition in error, and also upon the merits.

*E. H. Fourt,* for plaintiffs in error.

The evidence is totally insufficient to establish a marriage
contract between Dr. Schuelke, the deceased, and the de-
fendant in error. While the latter was occasionally intro-
duced by Dr. Schuelke as his wife, that was not usually so,
and he refrained from so introducing her to respectable
women of the community. She was not generally regarded
as the doctor's wife, but their relations were generally un-
derstood to be illicit.

An alleged foreign marriage will not generally be pre-
sumed to be valid, without a showing of compliance with
the laws of the country where it is alleged to have been
performed. (Canale v. People, 52 N. E., 210; Norcross v.
Norcross, 29 N. E., 506; Medway v. Needham, 16 Mass.,
157 (8 Am. Dec., 131.) A marriage in the District of
Columbia, where this contract is said to have been entered
into, is void unless solemnized according to law. It is so
held in Maryland, from which state the law of the District
of Columbia on the subject was taken. (Dennison v. Den-
nison, 35 Md., 361; Brown v. Becket, 6 D. C., 253.) A

marriage invalid where entered into is invalid everywhere. (1 Bish. M. & Div. (6th Ed.), 390.)   Cohabitation illicit in the beginning is presumed to have so continued until the contrary is proven.   (Williams v. Williams, 46 Wis., 464; 1 Jones on Ev., 183; 1 Bish. M. & D., 504; Ededstein v. Brown (Tex.), 80 S. W., 1027; Sims v. Sims (N. C.), 28 S. E., 407; Riddle v. Riddle (Utah), 72 Pac., 1081.)

The statutes of this state seem to be mandatory in respect to procuring license to marry, and preclude the idea of a marriage, except when celebrated in the manner prescribed. A license *must* be obtained.   (McLaughlin's Est. (Wash.), 30 Pac., 651; Ligona v. Buxton (Me.), 2 Greenl., 102; Com. v. Munson, 127 Mass., 459; Norcross v. Norcross, 29 N. E., 506; State v. Hodgkins, 19 Me., 155.)

Presumption of marriage from cohabitation and reputation is overcome by evidence of a separation.   (Maher's Est. (Ill.), 56 N. E., 124.)   The doctrine that a marriage resulted from contract of marriage *per verba de futuro* followed by cohabitation did not become a law of this state by the adoption of the common law of England.   (Cheney v. Arnold, 69 Am. Dec., 609; Burtis v. Burtis, 14 Am. Dec., 563; Dennison v. Dennison, *supra.*) . A mere contract of marriage was not a complete marriage, unless made in the presence of or with the intervention of a minister of Holy Orders.   (2 Pars. Cont. (5th Ed.), 75, 78.)   .

*Stone, Winslow & Gudmundsen* and *H. S. Ridgely,* for defendant in error.

There is no provision of law for the bringing of error proceedings in this cause; the decision of the district court is by statute made final and conclusive, and this court is without jurisdiction.   (R. S. 1899, Secs. 4835-4837; 88 Cal., 374; 17 Ency. L., 1060, *et seq.*; Wilson v Ter., 1 Wyo., 114; Mau v. Stoner, 14 Wyo., 183; Const., Art. V, Secs. 2, 18.)   The proceeding to determine heirship is a special proceeding for the settlement of estates of deceased persons, and the provisions of the code of civil procedure

relative to new trial, and error proceedings, are inconsistent and inapplicable. (26 Ency. L. (2d Ed.), 1; Smith v. Westerfield, 88 Cal., 374; *Ex parte* Smith, 53 Cal., 204; Bell v. King, 70 N. C., 330.) No provision regulating or allowing appeals applies to this proceeding. The bill of exceptions is not prepared, arranged and fastened together in proper order, and the pages of the same are not properly numbered as required by law and the rules of this court. The motion for a new trial is not embraced in the bill. There is no certificate of the trial court, or any officer thereof, that it is any part of the record in this case, and the same does not appear ever to have been filed in the district court, and is not certified by the clerk to be a part of the record. A motion for a new trial is not a part of the record unless incorporated in a bill of exceptions properly prepared, allowed and signed. (Seibel v. Bath, 5 Wyo., 409; Harden v. Card, 14 Wyo., 479.) The omission is such as cannot be amended. An appellate court will not permit a bill of exceptions to be withdrawn for the purpose of amendment or correction as a matter of course; and especially is this true where the mistake or omission is due to the laches of the party seeking relief. (Callahan v. Houck, 14 Wyo., 201; Freeburgh v. Lamoureux, 13 Wyo., 454.) The bill is not certified by the clerk to be the original bill of exceptions settled and allowed by the judge of the district court. It is sufficient as to this to call attention to the certificate of the clerk of the district court, and to the absence of any statement over his signature which would identify the bill of exceptions in the files of this court, with the bill settled and allowed and made a part of the record in the district court.

In the pleadings it is alleged that Emilie Weidenhoft was the mother and Johanna Schuelke the sister of the said Julius A. Schuelke, deceased, but there is no evidence that such was the fact. It is true that in the court below, for the purposes of the hearing, and so far as it affected the rights and interests of the defendant in error, she admitted

that the plaintiffs in error stood in the relationship claimed by them. But such admission was not binding upon the court, and could not be taken by the court in lieu of proof; neither was the admission sufficient, in the absence of positive evidence, to justify the court in making a finding in their favor; it could not be taken by the court as a substitute for the necessary proof of identity. The burden was upon the plaintiffs in error to establish their identity and relationship. (14 Cyc., 98; Hall v. Wilson, 14 Ala., 295; Anson v. Stein, 6 Ia., 150; Currie v. Fowler, 28 Ky., 145; Taylor v. Whiting, 4 T. B. Mon., 364; Emerson v. White, 29 N. H., 482; Morrill v. Otis, 12 N. H., 466; Birney v. Hann, 10 Ky., 322; Freeman v. Loftus, 51 N. C., 524; Goldwater v. Burnside, 22 Wash., 215.) We submit that plaintiffs in error here having failed to make sufficient proof, and there being no finding in their favor upon the evidence as to relationship, the court below cannot be held to have committed error in refusing to render judgment for them.

There existed between the defendant in error and the decedent a valid common law marriage, such as could only be terminated by death or a judicial decree; as such wife, upon his death, she became, under the law of descent of this state, the person to whom all of the estate of the said decedent should be distributed, had he died intestate, and she is entitled to take the same under the terms of the will. A direction to distribute "under the intestate laws" is a gift to a class. (McGowan's Est., 190 Pa. St., 375; 30 Ency. L., 718.) Taking under the will, the defendant holds by purchase and not by descent. (Allen v. Bland, 134 Ind., 78.)

A formal valid marriage will be presumed from cohabitation, acknowledgment and reputation. (19 Ency. L. (2d Ed.), 1202, 1204, and cases cited; Teter v. Teter, 101 Ind., 129.) The essentials are capacity and consent. A contract of marriage *per verba de praesenti* is valid. (Connors v. Connors, 5 Wyo., 433; Fornshill v. Murray, 18 Am. Dec., 344; 1 Bish. M. & D., 116.) A marriage established by

evidence is presumed to be regular and valid. (26 Cyc., 57; Green v. Norment, 5 Mackey, 80.) A marriage may be proved by circumstantial or presumptive evidence. (26 Cyc., 62, 68; Pierce v. Jacobs, 7 Mackey, 498; Senge v. Senge, 106 Ill. App., 140; Jennings v. Webb, 8 App. Cas. (D. C.), 43.) And by one of the parties thereto. (*In re* Richards, 133 Cal., 524; Com. v. Dill, 156 Mass., 226; Leighton v. Sheldon, 16 Minn., 243.) In the absence of any positive provision declaring that all marriages not celebrated in the manner prescribed shall be void, it is generally held that a marriage without conformity to such regulations is valid if the parties have entered into the contract according to the common law. (19 Ency. L. (2d Ed.), 1195, and cases cited; 26 Cyc., 20; Connors v. Connors, 5 Wyo., 433.) This marriage was contracted in the District of Columbia, and it may be of importance to observe that the common law is in force there, except in so far as it has been abrogated by act of Congress. (De-Forrest v. U. S., 11 App. Cas. (D. C.), 458; State v. Cummings, 33 Conn., 260; U. S. v. Griffen, 6 D. C., 53; U. S. v. Guiteau, 1 Mackey (D. C.), 498; *Ex parte* Watkins, 7 Pet. (U. S.), 568.) The common law of another state must be presumed to be the same as it is in the state of the forum, in the absence of evidence to the contrary. (10 Cent. Dig. Col., 864, and cases cited.) This state has adopted the common law. (R. S. 1899, Sec. 2695.) It will be presumed that the legislature in enacting a statute did not intend to make any alteration in the common law other than that specifically stated. (Cadwallader v. Harris, 76 Ill., 370; Hooper v. Baltimore, 12 Md., 464.) No provision of the law of Wyoming makes void marriages not celebrated in accordance with the statutory procedure. Under our law marriage is made a civil contract. (Sec. 2955.) Upon the authorites it would seem to be clear that a common law marriage is valid in the courts of this state, if the contract is proved to have been made either in the District of Columbia or in the State of Wyoming.

With reference, then, to the evidence: Marriage, like other contracts, may be proved by any species of evidence not prohibited by law which does not presuppose a higher species of evidence within the power of the party. (Beaudieu v. Ternoir, 5 La. Ann., 476.) To constitute a marriage good at common law, an express agreement between the parties to take and live with each other as husband and wife is not necessary. The agreement to do so is implied from their acts and conduct in mutually recognizing and holding each other out as bound together in the matrimonial state, and proof of such acts and conduct is proof of the marriage agreement. (Renfrow v. Renfrow, 60 Kan., 277.) The presumption arising from an illicit cohabitation in the beginning is rebuttable. (26 Cyc., 73.) It may be rebutted by direct evidence or by proof of circumstances from which a subsequent marriage can be inferred. (Id.; Caujolle v. Ferrie, 23 N. Y., 90; 26 Barb., 177; Wilcox v. Wilcox, 46 Hun, 32; Travers v. Reinhardt, 205 U. S., 424; Elzas v. Elzas, 171 Ill., 632; 2 Wigmore's Ev., 2082-3; Eversley Dom. Rel., 41; White v. White, 82 Cal., 427; Badger v. Badger, 88 N. Y., 546; State v. Worthingham, 23 Minn., 528; Adger v. Ackerman, 115 Fed., 124; Univ. v. McGuckin, 62 Neb., 489.)

Plaintiffs in error complain that the defendant in error does not state how the questions were answered by Dr. Schuelke, "whether in the affirmative or in the negative." There is, however, no room for uncertainty as to the fact—the "ultimate fact" that the parties then and there "mutually consented to a social relation," and this consent when established is just as effective whether evidenced by affirmative words or by "clear and unambiguous conduct." The evidence is ample as to the necessary facts to establish the marriage. A marriage entered into by contract between parties in one state, and followed by cohabitation and recognition of the relation in another state, is valid and binding. (Goodrich v. Cushman, 34 Neb., 460; Gibson v. Gibson, 24 Neb., 394; Travers v. Reinhardt, 205 U. S., 424.)

E. H. Fourt, for plaintiff in error, in opposition to the motion to strike and dismiss, contended that the judgment was appealable, and cited, in addition to various constitutional and statutory provisions as to appeals and the jurisdiction of the supreme court, the following cases:   Norman v. Curry, 27 Ark., 440;  Simpson v. Simpson, 25 Ark., 487; State v. Johnson, 103 Wis., 591;  Anderson v. Matthews, 57 Pac., 156;  Bank v. Ranch Co., 5, Wyo., 55;  Payne v. Davis, 2 Mont., 381;  Sutherland on Stat. Const., 440, 567; Martin v. Hunter, 1 Wheat., 304.   That the motion for new trial is properly in the bill and the bill properly certified.

BEARD, JUSTICE.

The defendant in error filed her petition in the district court of Fremont County, in the matter of the estate of Julius A. Schuelke, deceased, under the provisions of Section 4835, Revised Statutes 1899, to determine the heirship to the deceased, she claiming to be his widow and sole heir, and as such entitled to the residue of his estate upon final settlement.   The plaintiffs in error appeared and contested her claim and denied that she was the widow of deceased, and alleged that Emilie Weidenhoft, one of the plaintiffs in error, was the mother of deceased, and that Johanna Schuelke, the other plaintiff in error, was his sister, and that they were the sole and only heirs at law of siad deceased.   There was but one issue in the case, and that was whether the defendant in error was the lawful wife of Julius A. Schuelke at the time of his death.   The case was tried to the court without a jury, and the court found that the defendant in error was the wife of said Julius A. Schuelke at the time of his death, and as his widow would be entitled to all of the property of his estate in the hands of the administrator, subject to the payment of the debts of said estate and costs of administration, and entered a decree accordingly.   From that decree the plaintiffs in error bring the case here on error.

The defendant in error has filed a motion to strike the bill of exceptions from the files and to dismiss the proceed-

ings in error. The motion to strike the bill is based upon
several grounds, viz.: that the pages are not properly ar-
ranged and numbered; that the motion for a new trial is
not embraced in the bill; and that the bill is not properly
certified. This part of the motion has not been seriously
urged in oral argument and is not well taken. It is only
after an order has been made requiring the rearrangement
and numbering of the pages of the transcript, and that order
has not been complied with, that the cause may be dis-
missed in the discretion of the court. (Harden v. Card, 14
Wyo., 479, on p. 497.) No such order was applied for or
made in this case. A copy of the motion for a new trial
appears in the bill of exceptions, and the bill is properly
certified by the judge as a true bill, was filed and became
a part of the record in the case, and is enumerated in the
certificate of the clerk as one of the original papers filed in
the case and transmitted to this court in pursuance of the
order directing him to send up the original papers filed in
the case. It is the certificate of the court or judge to the
bill of exceptions that identifies the motion for a new trial
therein contained as the motion ruled upon, and the cer-
tificate of the clerk can neither add to nor detract from the
recitals contained in the bill. In this case the petition in
error was filed July 27, 1907, and the motion to strike the
bill was filed November 11, 1907. The bill was not filed
until November 14, 1907, and it is at least doubtful if the
motion can be considered as applying to the bill filed. The
motion to strike the bill will be denied.

The motion to dismiss the petition in error is based upon
the language of Sections 4835 and 4836, Revised Statutes
1899. Those sections are as follows:

"SEC. 4835. In all estates now being administered, or
that may hereafter be administered, any person claiming to
be heir to the deceased, or entitled to distribution in whole
or in any part of such estate, may, at any time after the
expiration of one year from the issuing of letters testamen-
tary or of administration upon such estate, file a petition in

the matter of such estate, praying the court to ascertain and declare the rights of all persons to said estate and all interests therein, and to whom distribution thereof should be made."

"SEC. 4836.   Upon the filing of such petition, the court or judge shall make an order directing service of notice to all persons interested in said estate to appear and show cause, at the first day of the next ensuing term of the court held in the county where said order is made, in which notice shall be set forth the name of the deceased, the name of the executor or administrator of said estate, the names of all persons who may have appeared claiming any interest in said estate in the course of the administration of the same, as the court or judge may direct, and also a description of the real estate whereof said deceased died seized or possessed, so far as known, described with certainty to a common intent, and requiring all said persons, and all persons named or not named having or claiming any interest in the estate of said deceased, at the time and place in said order specified, to appear and exhibit, as hereinafter provided, their respective claims of heirship, ownership or interest in said estate, to said court, which notice shall be served in the same manner as a summons in a civil action, upon proof of which service, by affidavit or otherwise, to the satisfaction of the court, the court shall thereupon acquire jurisdiction to ascertain and determine the heirship, ownership and interest of all parties in and to the property of said deceased, and such determination shall be final and conclusive in the administration of said estate, and the title and ownership of said property.   The court shall enter an order or decree establishing proof of the service of such notice."

It is contended that the language, "and such determination shall be final and conclusive in the administration of said estate," refers to the determination of the question in the district court and makes the judgment of that court final, from which no appeal can be taken; and that, therefore, this court is without jurisdiction.   It is argued that

as our code of probate procedure is taken from the California statutes, and that Sections 4835 to 4837, inclusive, are taken verbatum from Section 1664 of the California code, omitting only the provisions contained in the California statute for motion for new trial, and for proceedings in error or appeal; and that this omission clearly indicates an intention on the part of our legislature to cut off the right of appeal and to render the decision of the district court final.   An examination of Section 1664 of the California code discloses, however, that it contains the identical language contained in Section 4836 of our statutes, viz.: "and such determination shall be final and conclusive in the administration of said estate," and then in the same section provides for the trial of the issues as in civil action, "with like right to a motion for a new trial and appeal to the supreme court," etc.   We think it fair to assume that the legislature of California did not intend to declare in the first part of the section that the judgment of the trial court should be final and conclusive and then in a subsequent part of the same section provide for an appeal to the supreme court.   It is undoubtedly true that our code of probate procedure was taken from the California statutes.   Some things were omitted, and in other instances, such as the matter now under consideration, a change was made in the division of the law into sections and in arranging those sections under appropriate headings.   As originally adopted by the first state legislature, it was Chapter 70, Laws 1890-1, now Division 4, Revised Statutes 1899.   In that division, which (with subsequent amendments) contains our law of probate procedure, we find in Chapter 3, embracing Sections 4542 to 4557, inclusive, under the head of orders, decrees, process, minutes, records, trials and appeals, the following provisions:

"Sec. 4550.   Except as otherwise provided in this division, the provisions of the code of civil procedure are applicable to and constitute the rules of practice in the proceedings mentioned in this division.

"SEC. 4551. The provisions of the code of civil procedure, relative to new trials and appeals—except in so far as they are inconsistent with the provisions of this division—apply to the proceedings mentioned in this division.

"SEC. 4552. If no jury is demanded, the court must try the issues joined. * * * Either may move for a new trial on the same grounds and errors, and in like manner, as provided by law for civil actions."

These provisions clearly give a party the same right to appeal from the judgment of the district court in probate proceedings as in civil actions, unless the provisions of Section 4836, above quoted, takes away that right. That it was not intended to and does not do so we think is evident. The provisions of Sections 4835 to 4840, inclusive, were intended to provide an additional, more adequate and complete method of determining heirship to one dying intestate, and the rights of all parties claiming to be heirs or entitled to distribution in whole or in any part of such estate, than was otherwise provided by law. It authorizes any person so claiming to commence the proceeding at any time after the expiration of one year from the issuing of letters testamentary or of administration upon such estate, although the estate might not be in condition for distribution at that time; and provision is made for bringing in all parties, whether they have appeared or not, and all parties are required to appear and exhibit their respective claims of heirship, ownership or interest in the estate. As said in *In re* Burton, 93 Cal., 459, it was the intention "to provide a mode of proceeding by which *all persons who claim ownership* of or an interest in the property of an estate of a testator or an intestate, whether directly, as heirs and devisees, or indirectly, through the heirs or devisees, may have their rights and interests in and to such property conclusively ascertained, determined and declared, so far at least as the parties before the court are concerned, before distribution is decreed, to the end that the final distribution of the property may be made directly to the persons respectively entitled

thereto." It is the determination in such a proceeding of the *rights of all persons claiming an interest in the estate* that the statute makes final and conclusive, and not the judgment of the district court. In Blythe v. Ayres, 102 Cal., 254, the court said: "Section 1664 was clearly intended to provide the means by which, where there are hostile claimants to an estate, *all* the conflicting rights thereto may be summarily and finally determined in one proceeding." And in *In re* Blythe, 110 Cal., 231, in commenting upon this section, the court said: "It was intended to construct a wider, better and more just and effective method of determining heirship to one dying intestate, where there are many conflicting claimants of such heirship. It gives a longer time. and affords ampler opportunities to contestants to present and litigate their claims, than they formerly had when the ordinary decree of distribution was conclusive; and we have no doubt that the legislature intended by said section to make the decree under it conclusive against all persons, and the unquestioned basis for the decree of distribution which was to follow." These decisions clearly show the construction placed upon the language, "and such determination shall be final and conclusive," by the supreme court of California; and that is that when the question has once been litigated to a final determination in such a proceeding (which could only be in this court if either party appealed) it binds all parties and is final and conclusive as to the persons entitled to distribution and their respective rights, and those questions shall not be relitigated upon final distribution or in any other proceeding. In that construction we concur. This view is in harmony with the provisions of Section 4838, which is as follows: "Nothing in sections four thousand eight hundred and thirty-five, four thousand eight hundred and thirty-six and four thousand eight hundred and thirty-seven contained shall be construed to exclude the right upon final distribution of any estate to contest the question of heirship, title or interest in the estate so distributed, where the same shall not have

(12)

been determined under the provisions of said sections; but when such question shall have been litigated, under the provisions of said sections, the determination thereof as therein provided shall be conclusive in the distribution of said estate."

Counsel for defendant in error contend that the decision in the case of Mau v. Stoner et al., 14 Wyo., 183, is decisive of the question here presented. But we do not think that decision is applicable in this case. That was a proceeding for the appointment of a water distributer, was summary in notice, temporary in character, and to meet an immediate emergency. It was not an action or proceeding to determine the title or ownership of property; but, on the contrary, for the preservation of the rights of the parties temporarily; and the statute there construed expressly declared that the decision of the *district court, judge* or *commissioner* should be final. (State ex rel. Mau v. Ausherman, 11 Wyo., 410, pp. 432-3.) And it was held that in such a proceeding the legislature had the power to and did make such judgment final and that an appeal would not lie to this court; and that the amendment allowing an appeal from the judgment of the commissioner or judge to the district court still left the judgment of that court final. For the reasons above stated we are of the opinion that the matter is appealable, and that this court has jurisdiction. The motion to dismiss must, therefore, be denied.

We come now to a consideration of the only issue presented to the district court involved here, viz.: was the defendant in error the lawful wife of Julius A. Schuelke at the time of his death? She bases her claim solely upon an alleged verbal contract of marriage which she claims was entered into between herself and the deceased, March 17, 1901, at Washington, D. C.; and it is upon that alleged contract that her case must stand or fall. At the time of his death, which occurred August 7, 1903, Julius A. Schuelke was a practicing physician residing in Fremont County, this state. For a number of years prior to December 12, 1900, he was a

married man, and on the date last mentioned his then wife procured a decree of divorce from him in the district court of said Fremont County. From the uncontradicted evidence of the defendant in error it appears that she was with Dr. Schuelke in Wyoming in 1899, but in what capacity or what their relations were does not appear, but she states that she did not then live with him as his wife. That after that time and prior to March 17, 1901, she lived with him as his wife in the Philippine Islands, where he was an officer in the army. That they returned to the United States in March, 1901, and from August of that year up to the time of his death she lived and cohabited with him as his wife at Thermopolis, in said Fremont County. She testified that they had just returned from Europe and were at her mother's in Washington on March 17, 1901, and were thinking of coming west. That her mother objected to her going unless they were married. That "Dr. Schuelke objected to such formalities of that kind." That her mother then "got a prayer book and read the marriage service, which the doctor agreed to, and we then entered into an agreement and were married. From that time I considered it such and so did he." Elsewhere in her testimony, in speaking of their relations to each other, she says, she "objected and often spoke of a civil marriage, which he would not have because he said he did not care for it." In answer to the question, "At that time when you entered into this particular relation with him, did you there at that time take him as your husband and he take you as his wife?" she said: "Why, we answered all the questions that were contained in the marriage ceremonies of the Episcopal Church." She testified that her mother was not an officer authorized to perform the marriage ceremony, and in answer to the question, "Is your mother an ordained minister?" she answered: "No, indeed, she is not. We had one minister in the family and we thought that was sufficient." She also testified that the doctor always introduced her as his wife to people in Thermopolis and also at Washington, and

that she transacted business for him as his wife. Two let-
ters from the doctor to her were introduced in evidence, the
envelopes being addressed, "Mrs. Julius A. Schuelke," one
bearing date at Philadelphia, Pa., May 5, 1901, and the
other Lost Cabin, Wyo., March 25, 1902. In one he ad-
dresses her as "My Dear Lola," and closes it 'with "Yours
affectionately." In the other she is addressed as "Dear
Lola," and it closes with "Yours faithfully." Also a letter
from the doctor to her father, dated November 24, 1902,
the envelope being addressed, "Sam W. Small, Esq." In
the letter it is addressed to "My Dear Chaplain," and closes
with, "I am as always your sincere friend." A photograph
of the doctor was introduced, on the back of which is
written, "To Mrs. Major Julius A. Schuelke, from her
husband, the man who adores her at any and all times.
She liked him particularly in this costume and he always
appealed to her in uniform." She states that soon after they
came to Thermopolis he was going through a trunk and
found this photograph which he had had taken in Cuba and
gave it to her and wrote that on the back of it, and that she
was the person referred to. Two witnesses for defendant in
error testify that the doctor introduced her and held her out
as his wife. One of these witnesses testified that on one oc-
casion, when the doctor and this woman were travelng over-
land in August, 1901, the doctor invited him to go out to
their camp and meet his wife. The witness then says: "I
asked him if he was married. He said he was. I said,
'When did you get married, doctor?' He says, 'Early last
spring.' I says, 'Where?' He says, 'In Washington City.' "
That they then walked to the camp and the doctor intro-
duced the defendant in error as Mrs. Schuelke. On the
other hand, two witnesses testified that at one time she
stated that they were going to Chicago and were going to
be married. Another witness states that she told him in
1902 that they were not married, that she wanted the doctor
to marry her, but he would not. These conversations she
denies. The witness also testified that he said to the doctor,

"I always supposed you were married," and that he re-
plied, "Yes, a common law marriage; that is all." That
the doctor told him that his (doctor's) mother had asked
him, before their return to the United States, who this
woman was, and he told her she was his common law wife.

It is also in evidence that she and the doctor had quarrels,
at which times he called her the most vile names, told her
he would give her a short time in which to leave, that "she
had no string on him, and that she had bled two or three
men, but she could not bleed him any." Several witnesses,
both men and women, testified that the defendant in error
was not regarded as the doctor's wife; that the general
·impression among the people of the community was that
they were not husband and wife; that her reputation for
chastity and virtue in Thermopolis was bad. There is also
evidence that her reputation for truth and veracity in the
community was bad. Some of the witnesses stated that
she was generally reputed to be his mistress. The evidence
also shows, without contradiction, that in November, 1902,
she left the doctor and went to the State of Montana, and
there, in her presence and with her knowledge and consent,
was registered at a hotel as the wife of another man and
occupied the same room at the hotel with him. One witness
testified that the doctor told him that he first met her in
Cuba and that she followed him up until he couldn't get
away from her. The will of Dr. Schuelke, bearing date
July 30, 1902, which had been admitted to probate, was
introduced in evidence. By the terms of the will he revoked
all former wills, and particularly one made in favor of Elsie
M. Schuelke, formerly his wife, then divorced, and directed
all of his property to be distributed upon his decease in such
manner as the laws of the state of his residence might pro-
vide. The defendant in error is not mentioned or in any way
referred to in the will. The foregoing summary, we think,
is a fair statement of the material portions of the evidence
as it appears in the record.

From the evidence in this case there can be no question
as to the character of the relations between these parties

prior to March 17, 1901. According to her own testimony, she was 26 or 27 years of age and he was about 40 years old. They lived together as man and wife in the Philippines without any pretense that a marriage, contract of marriage or even a promise of marriage existed between them. Their illicit relations were entered into voluntarily and were continued, at least until their return to the United States, with a full knowledge that they were illicit. Whatever took place in Washington on March 17, 1901, if anything in fact occurred, looking to a change in their relations from meritricious to matrimonial was not occasioned by the desire of either for such change, but on account of the objections of her mother to her coming west unless they were married. But, notwithstanding this modest request of the mother, the doctor, not only then, but ever afterwards, objected "to such formalities," and refused to have any marriage ceremony performed and thus acknowledge her as his lawful wife in the manner provided by law. Granting all that she says occurred in the presence of her mother, we think it fails to establish a mutual contract of marriage. (Hantz v. Sealy, 6 Binn., 405; McKenna v. McKenna, 180 Ill., 577.) Aside from her statements of conclusions, that they entered into a contract and were married, all that her testimony amounts to is, that her mother read the marriage ceremony of the Episcopal Church and that they answered the questions. The service was not read by an authorized minister or officer, the prayer book was not put in evidence, nor does it appear how they answered the questions, whether in the affirmative or negative. And when she is asked the direct question if she at that time took Dr. Schuelke as her husband and he took her as his wife, she evades a direct answer and says: "Why, we answered all the questions contained in the marriage ceremony of the Episcopal Church." But there is no warrant for assuming that the questions, if they had been in evidence, were answered in one way more than in another. The mother of the defendant in error (the only competent living witness as to

what occurred between the parties in Washington) was not called as a witness nor was her testimony taken; and no reason for not doing so appears in the record. The defendant in error was a party to the proceeding, and the adverse parties·defended against her claim and claimed on their own behalf as heirs at law of the deceased. She was, therefore, an incompetent witness as to what occurred between her and the deceased under the provisions of Section 3683, Revised Statutes 1899. (Ullman v. Abbott, Adm'r., et al., 10 Wyo., 97; Sorensen v. Sorensen, 56 Neb., 729; *In re* Estate of Maher, 210 Ill., 160; Matter of Brush, 25 N. Y. App. Div., 610; Hopkins v. Bowers, 111 N. C., 175.) No doubt had objection been made to her competency as a witness to testify to such transactions, her testimony would have been excluded by the district court. But no such objection was made and the evidence, in the absence of such objection, was competent although the witness was not. (State v. Hughes, 106 Ia., 125; Coles v. Shepard, 30 Minn., 446; Hoog v. Wright, 174 N. Y., 36; Cribbin v. Jarvis et al., 67 Pac., 531.) The fact, however, that the statute makes her an incompetent witness should be considered in determining the weight to be given to her testimony.

Much reliance is placed by counsel for defendant in error upon the fact that the parties lived together as husband and wife and that he introduced her as such and addressed letters to her as Mrs. Julius A. Schuelke. That they lived together as man and wife both before and after the alleged contract of marriage is beyond dispute; but we do not think it at all strange that a man who has brought a woman into a community and has introduced her as his wife, would when away address letters to her in that way. But in none of the letters introduced does he address her or speak of her as his wife or of himself as her husband. He addresses her father as "My Dear Chaplain." In his will she is not mentioned either by name or as his wife. That one witness testified that the doctor said he was married in Washington City last spring is not entitled to much weight in determining

the actual relations of the parties when taken in connection
with the testimony of another witness that he stated that a
common law marriage was all that existed between them,
and that he had told his mother, before their return to the
United States and at a time when their relations to each
other were knowingly and confessedly illicit, that she was
his common law wife; and especially when it also appears
by uncontradicted testimony that after the date of the al-
leged marriage contract he called her the most vile names
imputing unchastity, told her he would give her a short time
in which to leave, that she had no string on him, and that
she had bled two or three men, but she could not bleed him.
It is undoubtedly true that where a man and woman long
live together, treating each other as man and wife, hold each
other out to the world as such, and so conduct themselves
toward each other and the community as to gain in the com-
munity a general and uniform reputation as being husband
and wife, that this is sufficient to create the presumption
that they have been lawfully married.  "But neither such
a course of life nor such declarations make a marriage, nor
do they even directly or affirmatively establish it.  They
may, if satisfactorily proved and sufficiently strong, be legit-
imate ground for inferring that there has been a valid mar-
riage."  (Arnold v. Chesebrough, 46 Fed., 700.  See also
Cartwright v. McGown, 121 Ill., 388; 2 Am. St. Rep., 105;
McKenna v. McKenna, 180 Ill., 577; Clayton v. Wardell,
4 N. Y., 230.)  To be evidence of marriage the cohabitation
must not have been illicit in the beginning.  When the co-
habitation is clearly shown (or as in this case confessed)
to have been illicit in the beginning, the presumption is that
it continues to be illicit until the contrary is established.
(Barnum v. Barnum, 42 Md., 251;  Brinkley v. Brinkley,
50 N. Y., 184;  Imboden v. Trust Co., 11 Mo. App., 220;
White v. White, 82 Cal., 427;  Powers v. Executors of
Charmbury, 35 La., 630;  Williams v. Herrick, 21 R. I.,
401;  Badger v. Badger, 88 N. Y., 546 (42 Am. Rep., 263);
Cartwright v. McGown, supra;  26 Cyc., 879, 889;  19

Ency. Law, 1206.)  In the case at bar it is admitted that
the cohabitation of the parties as husband and wife in the
Philippines was meretricious; and the fact that they con-
tinued such cohabitation after the alleged contract of mar-
riage does not of itself overcome the presumption that such
relations continued to be meretricious.  The general repu-
tation in the community where the parties resided as to
whether or not they are husband and wife is competent evi-
dence as tending to prove marriage.  It is in the nature of
a verdict of the community upon their relations, arrived at
from observing their conduct, their manner of life, their
deportment toward each other and the community, and
their declarations.  It is the general impression or belief
created in the minds of the people from those things which
constitutes the general reputation which may be shown in
evidence as tending to raise the presumption of marriage, or
the contrary.  To be of any value as evidence, such reputa-
tion must be general and uniform.  (White v. White,
*supra;* Arnold v. Chesebrough, *supra;* Jackson v. Jackson,
82 Md., 17; Barnum v. Barnum, *supra.*)  In the case be-
fore us there is no evidence that the parties were generally
reputed to be man and wife; but, on the contrary, the evi-
dence is that they were not generally so regarded and that
the general impression among the people was that she was
not his wife, but his mistress.  It is true that there is evi-
dence that he held her out and introduced her as his wife,
and lived with her as such; but that does not seem to have
satisfied the people of the community generally that she
was such in fact.  During the time she claims to have been
the wife of Dr. Schuelke she knowingly permitted herself
to be registered at a hotel as the wife of another man and
occupied the same room with him.  This is inconsistent
with her claim that she was at that time the lawful wife of
Dr. Schuelke, and tends to show that she did not so regard
herself.  Several witnesses testified that her reputation in
Thermopolis for chastity and virtue was bad, and two wit-
nesses testified that her reputation for truth and veracity

was also bad, and no witness testified to the contrary. There is very little direct conflict in the evidence in this case— that is, there are but few facts testified to by the witnesses on the one side which are denied or directly contradicted by the witnesses on the other side. The important question is, what is the correct conclusion to be drawn from all of the evidence in the case? We think the learned judge of the district court must have given undue weight to the evidence of cohabitation of the parties and that she was introduced and held out by Dr. Schuelke as his wife, and must have overlooked the presumption arising from their former illicit relations and the further fact that their conduct, manner of life and declarations failed to create in the minds of the people of the community the general impression or belief that they were in fact husband and wife.

Upon a consideration of all of the evidence, and with due regard to the finding and conclusion of the district court, we are impelled to the conclusion that the defendant in error has failed to establish her claim to be the lawful widow of Julius A. Schuelke, deceased. This conclusion renders it unnecessary to consider whether such a contract of marriage as the defendant in error claims was entered into, if proven, would constitute a valid marriage between the parties.

The judgment of the district court is reversed, and the case will be remanded to that court with directions to vacate and set aside the decree heretofore entered and to enter a decree adjudging the defendant in error not to be the widow of said deceased and not entitled to any part of his estate upon final distribution.          *Reversed and remanded.*

POTTER, C. J., and SCOTT, J., concur.